**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

COMMON CAUSE
805 15th Street NW
Washington, DC 20005, and

MICHAEL KHALILI,

*Plaintiffs*,

v.

MARKWAYNE MULLIN, in his official capacity as Secretary of the U.S. Department of Homeland Security,
2707 Martin Luther King Jr. Avenue SE
Washington, DC 20032,

U.S. DEPARTMENT OF HOMELAND SECURITY
2707 Martin Luther King Jr. Avenue SE
Washington, DC 20032,

DAVID VENTURELLA, in his official capacity as Director of Immigration and Customs Enforcement,
500 12th Street SW
Washington, DC 20536,

IMMIGRATION AND CUSTOMS ENFORCEMENT
500 12th Street SW
Washington, DC 20536,

MARCOS CHARLES, in his official capacity as Acting Associate Director of Enforcement and Removal Operations,
500 12th Street SW
Washington, DC 20536,

ENFORCEMENT AND REMOVAL OPERATIONS
500 12th Street SW
Washington, DC 20536,

Case No. ____________________

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

JOHN A. CONDON, in his official capacity as Acting Executive Associate Director of Homeland Security Investigations,
500 12th Street SW
Washington, DC 20536,

HOMELAND SECURITY INVESTIGATIONS
500 12th Street SW
Washington, DC 20536,

RODNEY S. SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Patrol,
1300 Pennsylvania Avenue NW
Washington, DC 20229,

U.S. CUSTOMS AND BORDER PATROL
1300 Pennsylvania Avenue NW
Washington, DC 20229,

TODD BLANCHE, in his official capacity as Attorney General,
950 Pennsylvania Avenue NW
Washington, DC 20530,

U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Avenue NW
Washington, DC 20530,

FEDERAL BUREAU OF INVESTIGATION
935 Pennsylvania Avenue NW
Washington, DC 20535,

KASHYAP PATEL, in his official capacity as Director of the Federal Bureau of Investigation,
935 Pennsylvania Avenue NW
Washington, DC 20535,

UNIDENTIFIED FEDERAL AGENCIES, and

UNIDENTIFIED FEDERAL OFFICERS,
in their official capacities,

*Defendants*.

## INTRODUCTION

1. In cities across the country, Americans have organized networks of constitutional observers to exercise their First Amendment rights and hold federal agents accountable as those agents carry out an aggressive and brutal deportation campaign. These constitutional observers observe federal agents' actions, taking special care to work safely within the bounds of the law and share what they have witnessed to create the public record necessary to hold federal agents accountable for their actions.

2. Holding the government accountable through peaceful exercise of First Amendment rights is the backbone of American democracy.

3. But Defendants have responded to constitutional observers' lawful attempts to create accountability for federal agents by establishing a policy of intimidating and retaliating against Americans who observe, record, and share information about federal immigration operations.

4. That policy is based on multiple directives from the highest levels of government—including President Trump's National Security Presidential Memorandum targeting "extremis[ts] on migration" and then-Attorney General Pam Bondi's instructions to all federal law enforcement to implement a nationwide strategy for investigating and prosecuting anyone opposed to the Administration's deportation campaign—to identify constitutional observers and use that information to deter and chill them from exercising their First Amendment rights.

5. As part of that policy, Defendants' agents have engaged in retaliatory and intimidating actions that fall into five categories: threatening use of force and arrest, collecting and using observers' personal information to intimidate them, using excessive force, pursuing criminal charges, and subjecting observers to administrative penalties (collectively, the "Intimidation and Retaliation Policy").

6. Defendants' Intimidation and Retaliation Policy sends a clear message: so long as constitutional observers seek to hold federal agents accountable, they will not be safe, even in their own homes. That policy would chill any ordinary person in the exercise of their constitutional rights to speak, associate with their neighbors, and observe federal law enforcement in public.

7. In addition to violating observers' First Amendment rights, Defendants have begun collecting new records in government databases about constitutional observers and using records contained in existing databases in new ways involving those same observers that violate the Administrative Procedure Act and the Privacy Act.

8. Because the Intimidation and Retaliation Policy is ongoing, absent injunctive relief, Plaintiffs must choose between abandoning their constitutional rights or being branded as "domestic terrorists" and subjected to a heightened risk of future adverse action through the immense power of the Federal government. The First Amendment protects Plaintiffs from being forced to make that choice.

**JURISDICTION AND VENUE**

9. This Court has jurisdiction to hear this case under 28 U.S.C. § 1331 because the claims in this action arise under the laws of the United States, including the U.S. Constitution and the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq*.

10. This Court has authority to issue declaratory and injunctive relief in this action under 28 U.S.C. §§ 2201 and 2202 and 5 U.S.C. § 706.

11. Venue is proper in this district under 28 U.S.C. § 1391(b) because more than one Defendant resides in this district. Defendants Department of Homeland Security and Department of Justice are headquartered in the District of Columbia, *id.* § 1391(e)(1)(A), and a substantial part of the events giving rise to Plaintiffs' claims occurred in this district, *id.* § 1391(e)(1)(B).

## PARTIES

**Plaintiffs**

12. Plaintiff **Common Cause** is a nonprofit, nonpartisan, grassroots membership organization headquartered in Washington, D.C. Its mission is upholding the core values of American democracy. Common Cause has nearly one million members in every congressional district in the country, staff in twenty-two state offices and the District of Columbia, and a presence in all fifty states. Common Cause works to create open, honest, and accountable government that serves the public interest; promotes equal rights, opportunity, and representation for all; and empowers all people to make their voices heard in the political process. Common Cause views First Amendment protections—including the right to assemble, speak, petition, and observe government conduct in public—as critical to American democracy.

13. Common Cause was founded in 1970 during sustained public protest over the Vietnam War on the premise that ordinary people should be able to confront and petition their government directly. For more than five decades, collective public expression has been Common Cause's main way of pursuing that mission. Common Cause's Civil Rights and Civil Liberties program works to build a democracy that protects civil society and its core principles, including the right to dissent, equal protection under the law, the freedom to organize and advocate for change, and an ongoing commitment to advancing diversity, equity, and inclusion. Defending the right to observe government conduct in public is a core function of this program and central to Common Cause's First Amendment work.

14. The right to give public voice to our concerns, oppose our government's actions, and support the ideals closest to us is in peril. Government officials in positions of power and influence seek to criminalize peaceful observation to benefit their own personal and political interests. Common Cause has stood against those efforts for five decades. The people power it has

built depends on First Amendment protections and the ability to observe and challenge government action.

15. One of Common Cause's core activities is promoting participation in political and policymaking processes. In pursuit of that mission, Common Cause files comments on federal rulemakings and agency actions affecting civil rights and civil liberties; coordinates comment and letter-writing campaigns and petition drives; hosts town halls and know-your-rights trainings; and organizes, co-sponsors, staffs, promotes, and turns members out to rallies, marches, vigils, and protests, including activities that address government conduct and public policy.

16. In line with this core activity to protect the First Amendment, Common Cause has organized know-your-rights events, rallies, and town halls to help its members and the public respond to the deployment of federal agents in their communities.

17. In Georgia, Common Cause responded to an immigration raid at a Hyundai plant by staffing a community legal aid and support clinic, where the team worked alongside local partners to educate impacted families and community members about their legal rights, how to locate and support their loved ones, and what accountability measures were available to people whose rights had been violated. The team then coordinated the community's engagement with local and statewide officials and helped members of the public file open records requests. Common Cause staff also helped facilitate several community conversations about community members' rights from an immigration and criminal defense perspective, distributing know-your-rights cards and explaining the difference between a judicial warrant and an administrative order. In March 2026, after reports that a growing number of localities were entering into agreements under Section 287(g) of the Immigration and Nationality Act, staff spoke with community members about those

agreements and about House Bill 1105. Common Cause organized a letter campaign opposing a 287(g) agreement in Gwinnett County.

18. In Florida and Texas, Common Cause held trainings for volunteer poll monitors, members, and the public on what to do if they encounter immigration agents at a polling place and how a person observing such an encounter can peacefully exercise the First Amendment right to document what they see. Common Cause's training materials for poll monitors include a section on immigration enforcement.

19. In Maryland, Common Cause has monitored immigration enforcement activity during the legislative session and assisted partners before and after hearings concerning that activity.

20. In California, Common Cause has conducted know-your-rights trainings and webinars, which included issues related to First Amendment rights to observe and document government conduct, ahead of the November 2025 special election.

21. Observing government action in public, documenting it, and sharing that documentation is a method Common Cause has used across its programs for decades.

22. When Defendants' agents photograph, record, follow, and threaten observers, Common Cause's ability to convene assemblies, recruit and retain volunteers, and operate its observation and voter protection programs is impaired.

23. The interests Common Cause seeks to protect are germane to its purpose. Common Cause exists to empower people to make their voices heard in the political process and to hold power accountable. The rights at issue here—to observe and record government conduct in public without being threatened and labeled a "domestic terrorist" for doing so—are the rights on which Common Cause's programs and its members' participation depend.

24. Common Cause's members are among the observers Defendants have targeted. Members who conduct constitutional observation have been photographed and recorded by federal agents, visited at their homes by federal agents, threatened with prosecution, barred from public property, and told that their faces have been run using facial recognition and that their information has been entered into government databases. *See infra* ¶¶ 25-67.

25. **Common Cause member 1** is a resident of the city of Maple Grove in Hennepin, County, Minnesota. Since 2025, Common Cause member 1 has participated in and led trainings for constitutional observers.

26. After the murder of Renee Good, Common Cause member 1 and other observers went to the scene of the shooting to observe DHS agents. They recall being filmed and/or photographed by at least two DHS officers and threatened with prosecution for observing the scene.

27. In January 2026, DHS agents came to their home while they were at work. Through their Ring camera, they observed four agents. The agents also stopped their neighbors and asked who lived in the house. According to the Ring camera footage, the agents were in their neighborhood for close to eleven minutes.

28. That same week, DHS agents appeared near Common Cause member 1's home and place of employment. They felt so concerned for their safety and the safety of their family that they rented an Airbnb for a few days.

29. Common Cause member 1 has continued to participate in constitutional observation because they think it is very important, but they experience more fear related to their safety and the safety of their family as a result of these incidents.

30. **Common Cause member 2** is a resident of the city of Salisbury in Wicomico County, Maryland. Since the summer of 2025, Common Cause member 2 has participated in constitutional observation of DHS and ICE agents at or near the DHS office in Salisbury, Maryland.

31. On September 12, 2025, Common Cause member 2 was in their car parked in the parking lot adjacent to the DHS office engaged in constitutional observation when a federal pulled beside them in his car. The agent was wearing a ball cap, sunglasses, and a mask up to his sunglasses.

32. After being questioned about their activities in the parking lot, Common Cause member 2 left the parking lot and prepared to head to their home, which is less than half a mile from the DHS office.

33. As they departed the parking lot, Common Cause member 2 noticed the agent following their car in his vehicle. Common Cause member 2 feared that the agent would follow them back to their house, so they pulled into a nearby parking lot for a commercial strip mall. After doing so, they noticed the agent pulled into a parking lot across the street, backed into the spot, and faced toward and watched Common Cause member 2's car for approximately 12 minutes before driving off.

34. Common Cause member 2 witnessed the agent using his phone to photograph them and the license plate of their car.

35. Common Cause member 2 was terrified by this experience. Common Cause member 2 is over the age of 70 and has serious medical conditions, including a prior heart attack and ongoing heart problems, for which they wear a medical alert device around their neck.

36. After returning home, Common Cause member 2 recorded a video recounting the

experience, out of fear that the experience might trigger a heart attack or medical episode and out of a desire to have their experience recorded somewhere.

37. Since the September 2025 incident, Common Cause member 2 has not returned to the DHS parking lot to conduct constitutional observation. They are afraid that agents will again harass, intimidate, threaten, or follow them.

38. After conducting constitutional observation nearly daily, the September 2025 incident convinced Common Cause member 2 to stop their observation activity. Their reticence to return is the result of fear that agents will further retaliate against them or their family.

39. **Common Cause member 3** is a resident of the city of Salisbury in Wicomico County, Maryland. Since April 2025, Common Cause member 3 has participated in constitutional observation of DHS and ICE agents at or near the DHS office in Salisbury, Maryland. Common Cause member 3 engages in constitutional observation approximately eight times per month for varying amounts of time.

40. Common Cause member 3 has experienced multiple instances of retaliation from ICE agents for their constitutional observation. This retaliation has included photographing Common Cause member 3, reporting their observation to local police, and successfully banning them from a public parking lot.

41. On April 21, 2026, Common Cause member 3 was observing an ICE facility from a nearby public parking lot. They sat in their car during this observation and spent time silently meditating. Two ICE vehicles pulled in behind their car, blocking them into the public lot. The ICE agents then got out of their vehicle. Common Cause member 3 got out of their vehicle because they are aware that people have been accused of using their vehicles as weapons towards ICE and they did not want to be similarly accused. Common Cause member 3 proceeded to calmly put their

hands on their head.

42. The agents looked through the rear window of Common Cause member 3's vehicle and noted that they had multiple pro-democracy signs. The agents called them a "social agitator."

43. The ICE agents said that Common Cause member 3 was trespassing on DHS property, even though Common Cause member 3 was on public property. The ICE agents told them that the agents knew who Common Cause member 3 was and that the agents had put their face through facial recognition.

44. The agents called local police and requested that Common Cause member 3 be banned from the public parking lot where they were parked. The parking lot is connected to multiple public buildings, including a Social Security Administration office. Initially, the police said Common Cause member 3 could continue coming to the public parking lot but should avoid the parking lot outside of the ICE facility.

45. On April 23, 2026, after observing the ICE facility from the public parking lot, Common Cause member 3 left the lot. A few minutes later, local police pulled them over. An ICE vehicle then pulled over behind the local police. Local police told Common Cause member 3 that ICE had reported her for trespassing. ICE requested that Common Cause member 3 again be banned from the public parking lot. Local police informed Common Cause member 3 that they were banned from the public parking lot indefinitely, except to address any Social Security-related issues. As local police began to leave, the ICE agent walked up to Common Cause member 3 and poked them, saying, "Stay away from our f*cking home." Common Cause member 3 tried to report the incident to local police but was told that they needed to report it to DHS instead.

46. Since this incident, Common Cause member 3 changed their constitutional observation to drive past the ICE facility without pulling into any nearby parking lots. Common Cause member 3 has been followed by ICE agents multiple times after driving past the ICE facility.

47. **Common Cause member 4** is a resident of the borough of Wenonah in Gloucester County, New Jersey. Since around May 2026, Common Cause member 4 has participated in constitutional observation outside the Delaney Hall ICE detention facility in Newark, New Jersey. Common Cause member 4 has been to Delaney Hall between 30-40 times, or roughly 2-3 times a week, and continues to engage in constitutional observation of ICE and DHS at Delaney Hall.

48. On or about May 28, 2026, Common Cause member 4 was observing and filming federal agents at Delaney Hall. Common Cause member 4 was having conversations with agents and directing profanity and other constitutionally protected offensive language at agents. In response to Common Cause member 4's filming, observing, and remarks, one agent approached Common Cause member 4 and shoved them to the ground.

49. Later that same evening, while Common Cause member 4 was still at Delaney Hall using their phone to film ICE and DHS agents, an agent grabbed Common Cause member 4's shoulder from behind, flipped them onto the ground, removed their goggles, and pepper sprayed them directly in the face and eyes. *See infra* ¶ 218. Common Cause member 4 reached their hand out for assistance while getting pepper sprayed and was then grabbed by the agents and dragged inside Delaney Hall.

50. Once inside, agents took Common Cause member 4's wallet—which contained identifying information, including a driver's license—and phone. Agents searched through their wallet without their consent. A DHS agent then initiated what Common Cause member 4 felt was an odd, extra-legal conversation meant to determine in real time who was at fault. Barely able to

see and under duress, Common Cause member 4 held their phone up to the agent to view the recorded interaction and demonstrate that Common Cause member 4 was not the aggressor. After viewing Common Cause member 4's video, the agent conferred with other agents and proceeded to release Common Cause member 4. Before being released, the agent told Common Cause member 4 it was possible charges could be filed against them later.

51. Federal agents have also filmed Common Cause member 4 while engaged in constitutional observation outside Delaney Hall. One night, the agents concluded their filming by saying, "Ok, we've got enough" or something to that effect. Common Cause member 4 interpreted this statement as evidence that ICE and DHS are compiling information on them for potential criminal charges.

52. Following these two incidents, Common Cause member 4 is alert to potential additional retaliation as a consequence of their continued constitutional observation at Delaney Hall.

53. **Common Cause member 5** is a resident of the city of Montville in Morris County, New Jersey. Since November or December 2025, Common Cause member 5 has participated in constitutional observation of ICE in Morristown, Dover, and surrounding communities in New Jersey. Common Cause member 5 continues to engage in constitutional observation of ICE and DHS.

54. On July 8, 2026, Common Cause member 5 observed multiple vehicles in Dover, New Jersey, that they believed to be associated with DHS and reported that information to local ICE watch groups. After following multiple vehicles, Common Cause member 5 parked their vehicle, got out of the car, and approached the suspected DHS vehicles to view their license plates

and report back the information. Common Cause member 5 then heard their full name announced over a speaker system from one of the suspected DHS vehicles.

55. Common Cause member 5 was shocked and scared at hearing their full name called out, in public, by DHS agents. They interpreted this event as an attempt to intimidate Common Cause member 5 and their fellow constitutional observers and to discourage them from continuing to engage in constitutionally protected activity. Common Cause member 5 believes that the DHS agents used Common Cause member 5's license plate to search for and find their full name.

56. While Common Cause member 5 persists in their constitutional observation activities, other observers have been deterred by Common Cause member 5's experience. Common Cause member 5 believes that the risks of retaliation are real and are part of a concerted effort by ICE and DHS to discourage constitutional observation.

57. **Common Cause member 6** is a resident of the city of Wharton in Morris County, New Jersey. Since May 2026, they have participated in constitutional observation of ICE in and around Morris County. Common Cause member 6 engages in constitutional observation 2-3 times per week.

58. Common Cause member 6 takes care to be non-confrontational when engaging in constitutional observation and always follows suspected ICE or DHS vehicles from a safe distance while obeying traffic laws.

59. On July 27, 2026, Common Cause member 6 drove out to a location where ICE agents had been reported. As other individuals engaged in constitutional observation identified a suspected ICE vehicle, Common Cause member 6 followed the vehicle as it left the neighborhood. Common Cause member 6 remained behind the ICE vehicle, following at a safe distance and obeying all traffic laws, while reporting the location of the vehicle back to other observers.

60. As Common Cause member 6 continued to follow the agent, they noticed that the agent was driving into Common Cause member 6's neighborhood. Common Cause member 6 continued to follow the vehicle as it turned down a street that led to the cul-de-sac where Common Cause member 6's house is. The vehicle remained in the cul-de-sac for a few minutes before leaving.

61. Common Cause member 6 believes that the agent viewed Common Cause member 6's license plate, found their address, and led them back to their house to intimidate them. Common Cause member 6 interpreted this event as intimidation. Common Cause member 6 was shaken up that day and described what happened to their spouse. They fear future attempts to intimidate them from participating in constitutional observation.

62. **Common Cause member 7** is a resident of the city of Gillette in Morris County, New Jersey. Since August 2026, they have engaged in constitutional observation of ICE and DHS agents.

63. On August 28, 2026, Common Cause member 7 heard that ICE was detaining members of the community. They drove to that location, pulled over on the opposite side of the road, and started to film DHS agents detaining people. Common Cause member 7 asked why the agents were wearing masks, which is against New Jersey law. Rather than responding to their question, another DHS agent stated Common Cause member 7's full name and told them to keep moving.

64. When Common Cause member 7 continued to observe, the DHS agent again announced their full name and asked if they wanted a visit from one of DHS's investigators. The agent then stated Common Cause member 7's full address.

65. Another legal observer pulled over about three minutes into Common Cause member 7's observation. About a minute after the second observer pulled over, a DHS vehicle pulled in front of both Common Cause member 7 and the other observer, obstructing their view of the detention taking place and preventing them from filming it. The DHS vehicle also blocked a lane of traffic.

66. Because of how the DHS vehicle stopped, Common Cause member 7 also could not leave until after the other observer parked next to them left.

67. This experience scared Common Cause member 7. They now fear that DHS agents will show up at their house, which they share with two teenage children. Despite this fear, they plan to continue observing.

68. Plaintiff **Michael Khalili** is a resident of the city of Minneapolis in Hennepin County, Minnesota. For months, Mr. Khalili has worked with his neighbors to track, observe, document, and disseminate information about Defendants' activities around the Twin Cities. On several occasions, federal agents have taken photos of Mr. Khalili's vehicle and collected biometric information or photographs of his face because Mr. Khalili was observing and documenting their actions in public.

69. On March 18, 2026—one day after a tense interaction with a federal immigration agent who photographed Mr. Khalili's vehicle and face because he was following and observing the federal agent—Mr. Khalili had his Global Entry status revoked. On information and belief, his Global Entry status was revoked because the federal agent searched for his information in a federal database, found that Mr. Khalili acted as a legal observer in the past, and triggered the process to revoke Mr. Khalili's Global Entry status.

70. On May 4, 2026, Mr. Khalili was following an ICE vehicle when the ICE agent pulled over and presumably called a Minnesota state trooper for assistance. The state trooper spoke with the ICE agent at length and then spoke with Mr. Khalili while the ICE agent left the scene. The state trooper told Mr. Khalili that they were aware he had followed federal immigration agents on multiple occasions, Mr. Khalili's actions constituted harassment, and Mr. Khalili would be charged with a crime if he continued observing federal immigration agents. On information and belief, Mr. Khalili suspects that the ICE agent asked the state trooper to interfere with and threaten Mr. Khalili with arrest for exercising his First Amendment right to observe federal law enforcement in public.

71. Following this incident, Mr. Khalili took time off from observing. He returned after hearing reports of multiple suspected ICE vehicles in the community along with a shortage of constitutional observers. That day, Mr. Khalili observed some of the suspected ICE vehicles staking out a specific home.

72. On May 11, 2026, DHS restored Mr. Khalili's Global Entry privileges after a reporter contacted the agency about his case.

73. On June 16, 2026, DOJ announced charges in *United States v. Sant*, indicting 15 community organizers—known as the Minneapolis 15—who responded to ICE's enforcement activity. *See* Indictment, *United States v. Sant*, No. 0:26-cr-00115 (D. Minn. June 11, 2026), ECF No. 1. One of the defendants lived at the home from the earlier stake out that Michael had observed. After reading the indictment, Mr. Khalili also realized that one of the charges against Isaac Sant was for similar ICE observation activity as his own on the same day the state trooper threatened him with charges.

74. The trooper's May 4, 2026 threat of criminal penalties, DOJ's Minneapolis 15 indictment, and the revocation of his Global Entry status had a significant chilling effect on Mr. Khalili's constitutional observation. In June 2026, Mr. Khalili and his wife decided that he should stop observing permanently for fear that the federal government would come to their home and arrest him in front of his children.

75. On August 10, 2026, at the end of a recent international trip, Mr. Khalili was directed to a secondary location when passing through U.S. immigration. He had never been detained at an immigration checkpoint previously. Mr. Khalili's children were with him and were also sent to the secondary location. The officer held onto Mr. Khalili's passport while he was detained in the secondary location. After a 15-minute delay, a different agent asked him multiple questions about his time abroad. He and his children were then released.

76. Also in August 2026, after multiple interactions with DHS agents, Mr. Khalili requested his motor vehicle records from the Minnesota Driver and Vehicle Services. An employee said that law enforcement queries were held by another agency, the Bureau of Criminal Apprehension. The Bureau's records showed that before this year, there were only two queries of his license plate, driver's license, and/or name and date of birth. Once he started constitutional observation, those queries increased dramatically. Over a four-month period beginning in March 2026, federal, state, and local law enforcement officers ran his license plate, driver's license, and/or name and date of birth to identify him 55 times.

**Defendants**

77. Defendant **Markwayne Mullin** is the Secretary of the U.S. Department of Homeland Security ("DHS"). On information and belief, Secretary Mullin has maintained a pattern or practice of authorizing DHS agents to add legal observers to one or more federal watchlists and

use that information to threaten, intimidate, launch criminal investigations, and revoke government benefits from legal observers. He is sued in his official capacity.

78. Defendant **DHS** is a Cabinet-level agency of the United States, 6 U.S.C. § 111, and agency within the meaning of the APA, 5 U.S.C. § 551(1). Its missions include anti-terrorism, border security, immigration, and customs. It is headquartered in Washington, D.C.

79. Defendant **David Venturella** is the senior official currently performing the duties of the Director of Immigration and Customs Enforcement ("ICE"). Director Venturella is sued in his official capacity.

80. Defendant **ICE** is a component of DHS and agency within the meaning of the APA, 5 U.S.C. § 551(1). ICE is headquartered in Washington, D.C. Its stated purpose is to "[p]rotect America through criminal investigations and enforcing immigration laws to preserve national security and public safety."

81. Defendant **Marcos Charles** is the senior official currently performing the duties of the Associate Director of Enforcement and Removal Operations ("ERO") of ICE. He is sued in his official capacity.

82. Defendant **ERO** is an operational component of ICE that is charged with arresting and removing non-citizens who present a danger to public safety or national security, as well as those who enter the country illegally. It is an agency within the meaning of the APA. 5 U.S.C. § 551(1).

83. Defendant **John A. Condon** is the senior official currently performing the duties of the Executive Associate Director of Homeland Security Investigations ("HSI"). He is sued in his official capacity.

84. Defendant **HSI** is "the principal investigative component" of DHS. It is an agency within the meaning of the APA. 5 U.S.C. § 551(1).

85. Defendant **Rodney S. Scott** is the Commissioner of U.S. Customs and Border Patrol ("CBP"). He is sued in his official capacity.

86. Defendant **CBP** is a component of DHS and agency within the meaning of the APA, 5 U.S.C. § 551(1). CBP is headquartered in Washington, D.C.

87. ICE, ERO, and HSI employees are among the federal officers who have collected and maintained information about legal observers and used that information to threaten, intimidate, launch criminal investigations, and revoke federal benefits because legal observers exercised their rights to observe federal law enforcement officers in public.

88. Defendant **Todd Blanche** is the Attorney General of the United States. The Office of the Attorney General "supervises and directs the administration of the Department of Justice, including the Federal Bureau of Investigation . . . and the U.S. Attorneys and U.S. Marshals service." National Security Presidential Memorandum-7 requires the Attorney General to direct Department of Justice staff to "prosecute all federal crimes, to the maximum extent permissible by law," relating to investigations of individuals the Administration believes are obstructing federal immigration enforcement. *See* Countering Domestic Terrorism and Organized Political Violence, Nat'l Sec. Presidential Mem.-7, 90 Fed. Reg. 47225, 47226 (Sep. 25, 2025) ("NSPM-7"). Employees of the Attorney General's Office have shaped DHS policy by labeling legal observers as "domestic terrorists" and directing U.S. Attorneys to prosecute those observers for engaging in First Amendment-protected activity. *See infra* ¶¶ 127-48. Justice Department officials have also coordinated indictments against legal observers to implement NSPM-7.

89. Defendant **U.S. Department of Justice** ("DOJ") is a Cabinet-level agency of the United States. 28 U.S.C. § 501. Its mission is to uphold the rule of law, keep our country safe, and protect civil rights. It is headquartered in Washington, D.C.

90. Defendant **Federal Bureau of Investigation** ("FBI") is a component of DOJ and an agency within the meaning of the APA, 5 U.S.C. § 551(1). The FBI is headquartered in Washington, D.C.

91. Defendant **Kashyap Patel** is the Director of the FBI. He is sued in his official capacity.

92. Defendants **Unidentified Federal Agencies** are unidentified agencies or departments of the U.S. government whose employees or agents, acting under color of federal law and within the scope of their employment and duties with the respective agencies by which they are employed or for which they are agents, are participating in the unlawful conduct described in this Complaint.

93. Defendants **Unidentified Federal Officers** are unidentified agents and officers of federal agencies—including DHS, ICE, ERO, HSI, CBP, and DOJ—acting under color of federal law and within the scope of their employment and duties with the respective agencies by which they are employed or for which they are agents, who are participating in the unlawful conduct described in this Complaint.

94. Each Defendant has contributed to and acts in furtherance of the Intimidation and Retaliation Policy.

## FACTUAL ALLEGATIONS AND LEGAL BACKGROUND

### I. Peaceful observation of law enforcement is a well-established and constitutionally protected means of expression, dissent, and accountability.

95. Americans have long monitored law enforcement, including federal officials, to expose misconduct and brutality and protect vulnerable communities.

96. For the past fifteen years, personal cell phones and social media have allowed legal observers to quickly document and disseminate multiple fatal encounters. Those recordings have been central to political discourse driving changes to how law enforcement interacts with the communities they police.

97. For many Americans, including Plaintiffs, steadfast observation of law enforcement is a means of expressing their belief in public accountability, the importance of restraint by those equipped to use deadly force, and the insufficiency of current institutions to ensure constitutional policing.

98. Indeed, for Plaintiffs, legal observation is a central means by which they register their dissent from the Administration's extreme and often brutal immigration tactics.

99. Plaintiffs join other Americans who have used constitutional observation as part of overarching campaigns of political dissent.

100. During the Civil Rights Movement, individuals and groups organized to monitor police activity with the goal of deterring harassment and preventing abuse and brutality. In 1965, civil rights organizers formed "Freedom Patrols" in Black and brown neighborhoods in Seattle, Washington. In 1966, the Black Panther Party conducted armed citizen patrols in Oakland, California. And in 1968, the National Lawyers Guild established a legal observer program in New York City to monitor police during protests.

101. In the 1990s, Berkeley Copwatch launched in response to local police tensions, focusing on non-violent systematic street monitoring, distribution of cameras, and know-your-rights trainings. One year later, in 1991, a video capturing the Los Angeles Police Department's beating of Rodney King challenged official police accounts of the incident and sparked nationwide discussions of racially biased policing.

102. The First Amendment supports Americans' right to dissent through observation. It protects photos, videos, and recordings. *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 790 (2011). For this protection to have any meaning, the First Amendment must likewise protect the act of creating that material.

103. The First Amendment also provides some protection for gathering news and information, particularly about government affairs. *See Branzburg v. Hayes*, 408 U.S. 665, 681 (1972).

104. Drawing upon these principles and the inherently expressive nature of constitutional observation, courts have repeatedly found that the First Amendment protects the right to peacefully observe and/or record law enforcement officers engaged in their official duties in public.

105. Common Cause is committed to promoting peaceful observation of federal immigration agents and training its members on how to peacefully exercise their First Amendment rights. For example, it held trainings in Florida and Texas for poll monitors and members of the public on what to do if they encounter ICE at the polls and how to lawfully document such encounters. In California, Common Cause conducted know-your-rights trainings, which included information on the First Amendment right to observe and record government officials conducting their duties in public. Common Cause trainings emphasize the importance of observing within the

bounds of the law, including observing from public property, maintaining a safe distance without physically interfering with or obstructing law enforcement officers, and more.

106. Common Cause members described above also ensure that their observation activities are lawful and peaceful. Common Cause member 1, for instance, has led trainings for constitutional observers that walk through the parameters of how to conduct observation within the bounds of what is permitted by law. Common Cause member 3 has abided by police instructions to stay out of a parking lot they are allegedly banned from, although it is a public lot that includes multiple government agencies and services. Common Cause member 7 pulled over on the opposite side of the road and conducted their observation without impeding traffic or disrupting Defendants' actions.

107. Likewise, Michael Khalili takes steps to ensure he engages in peaceful, constitutional observation. His goal is to identify, observe, and take photos and videos of federal immigration agents to document and disseminate information about their activities to the public. While in his vehicle, he follows agents from a safe, reasonable distance and complies with all traffic laws.

## II. Defendants have responded to political dissent concerning its extreme immigration enforcement practices by adopting the Intimidation and Retaliation Policy against Americans engaged in First Amendment-protected observation.

108. Since returning to office in 2025, President Trump and his Administration have taken major steps to reshape immigration policy and enforcement in pursuit of his campaign promise to execute "the largest domestic deportation operation" in U.S. history. The Administration has carried out deportation flights, sometimes to third countries where individuals

have no existing ties; attempted to end birthright citizenship; and granted expanded or new powers to various federal, state, and local officials to enforce domestic immigration laws.

109. As part of this mass deportation campaign, the Trump Administration has deployed thousands of federal law enforcement officers to cities across the country. This has included aggressive operations in Washington, D.C. and the surrounding areas of Maryland and Virginia; Los Angeles, California; Memphis, Tennessee; Portland, Oregon ("Operation Skip Jack"); Chicago, Illinois ("Operation Midway Blitz"); Minnesota ("Operation Metro Surge"); New Orleans, Louisiana and surrounding areas in Southeast Louisiana and Mississippi ("Operation Swamp Sweep"); Charlotte, North Carolina ("Operation Charlotte's Web"); New York, New York ("Operation Rotten Apple"); and Maine ("Operation Catch of the Day").

110. These extreme practices have sparked a public and sustained outcry from many Americans who disagree strongly with the Administration's goals and tactics.

111. Thousands of people—including Common Cause's members and Michael Khalili—have mobilized across the country to observe, monitor, record, and otherwise supervise Defendants as they engage in an unprecedented wave of immigration enforcement.

112. Defendants have responded to these peaceful and legal efforts to observe federal agents by abandoning prior policies that protected constitutional rights and replacing them with the Intimidation and Retaliation Policy.

113. In furtherance of that policy, Defendants deploy powerful investigative tools—including a dragnet of drones, body cameras, face-scanning apps, license plate scanners, and camera phones—to, as one memo instructed, "capture all images, license plates, identifications,

and general information on hotels, agitators, protestors, etc., so we can capture it all in one consolidated form."[1]

114. Defendants' Intimidation and Retaliation Policy dissuades and chills legal observation. It accomplishes this goal through retaliatory actions that fall into five categories: threatening use of force and arrest, collecting and using observers' personal information to intimidate them, using excessive force, pursuing criminal charges, and subjecting observers to administrative penalties. All five are directed at legal observers for no reason other than their exercise of the right to peacefully observe and record law enforcement officers carrying out their duties in public.

115. Defendants' new Intimidation and Retaliation Policy broadly authorizes retaliation by wrongly classifying legal observation as criminal activity. Defendants further encourage this retaliation by failing to hold any law enforcement agents accountable for their abuses of power. The result is a well-documented, ongoing pattern of intimidation and retaliation against legal observers across the country.

### A. Defendants have departed from longstanding policies intended to protect First Amendment rights.

116. The Administration has dismantled significant guardrails to protect the constitutional rights of lawful observers. The result: constitutional observers are more likely to have their personal information collected, be added to a government watchlist, and have federal agents conduct invasive searches for data on the intimate details of their lives than ever before.

117. A 2019 DHS memorandum expressly prohibited the kind of record collection and maintenance at issue here. The memorandum directed that all DHS personnel "shall not collect,

[1] Jeff Winter & Priscilla Alvarez, *Alex Pretti broke rib in confrontation with federal agents a week before death, sources say*, CNN (Jan. 27, 2026), https://perma.cc/B69X-C98D.

maintain in DHS systems, or use information protected by the First Amendment ***unless*** (a) an individual has expressly granted their consent for DHS to collect, maintain, and use that information; (b) maintaining the record is expressly authorized by a federal statute; or (c) that information is relevant to a criminal, civil, or administrative activity relating to a law DHS enforces or administers." Memorandum from Kevin K. McAleenan, Acting Sec'y of Homeland Sec. to All DHS Employees, Info. Regarding First Amend. Prot. Activities at 2 (May 17, 2019) ("2019 First Amendment Protections Memo"). The policy also prohibited DHS personnel from "pursu[ing] by questioning, research[,] or other means, [sic] information relating to how an individual exercises his or her First Amendment rights unless one or more of the same conditions applies." *Id.*

118. The memorandum included a prohibition on collecting information about an individual's "political or personal beliefs or associations," "reporting activities and documentation" in the case of journalists, or "an individual's associations with others for lawful purposes, including participation in protests or other non-violent demonstrations against government policy or actions." *Id.* at 1-2.

119. While DHS has asserted in litigation that the 2019 memorandum continues to reflect current DHS policy, the public record suggests that assertion is a litigation position not reflected in practice. Just hours before filing an opposition to plaintiffs' request for relief in litigation about ICE's unconstitutional retaliation against Americans for their First Amendment activities, the Director of the Boston Field Office of ICE's Enforcement and Removal Operations Division sent an email to all staff asking agents to "review the memorandum and adhere to the guidance within."[2] The government then relied on that email as evidence of its commitment to

[2] Defs.' Opp. to Pls.' Mot. for TRO, Ex. A, *Hilton v. Mullin*, No. 2:26-cv-00092 (D. Me. Mar. 10, 2026), ECF No. 18-3 ("Boston ERO Field Office Email"); Schuyler Mitchell, *DHS Waited Until*

protecting the First Amendment.[3] But when the Director of the Boston Field Office sent this policy via email, DHS's website listed the 2019 memo as "Archived."[4] DHS only removed the "Archived" label two days later in response to a journalist's query and refused to explain why the policy had been archived and then reinstated.[5]

120. Whistleblower accounts also show that ICE has implemented secret policies that contradict official public-facing guidance and established constitutional protections. One former ICE attorney in charge of training new ICE officers, Ryan Schwank, explained in an interview that on his first day as a legal instructor he was shown a memo from Acting ICE Director Todd Lyons that directed ICE officers to ignore the Fourth Amendment's judicial warrant requirements before they enter private homes as long as they have an I-205 administrative warrant. Schwank's supervisors told him he was allowed to read the Lyons memo but was not allowed to make a copy or take notes on its contents. Schwank's supervisors also told him that DHS would not document that it was training new officers differently based on the Lyons memo. ICE officials told Schwank he should "[d]eliver the information verbally" so there would be "no paper trail." The Lyons memo directly conflicted with the publicly available written training materials Schwank taught from, which said, "[A]n I-205 admin warrant is not a search warrant. You may not use it to enter into a protected or private area." As Schwank put it, DHS's "training documents sa[id] the exact opposite of what the policy says."[6]

---

*It Was Sued to Remind ICE Agents About the First Amendment*, Mother Jones (Mar. 18, 2026), https://perma.cc/7PL9-U5RN.

[3] *See* Boston ERO Field Office Email.

[4] Mitchell, *supra* note 2.

[5] *Id.*

[6] This Am. Life, *Episode 882, Give a Little Whistle*, (Mar. 6, 2026), https://www.thisamericanlife.org/882/transcript.

121. DHS has likewise dismantled its internal mechanisms for the public and its own staff to report concerns that DHS may be violating Americans' civil rights. Schwank looked for internal avenues within ICE to report his concerns but found that the agency's Office for Civil Rights and Civil Liberties and Office of the Ombudsman were "essentially gone." Schwank considered reporting his experience to the Office of the Inspector General, but he heard rumors online that if he "reported to OIG," there was a "good chance that OIG would out [him] to [his] own management." With nowhere else to turn, Schwank reported his experience to Congress and spoke to the press.[7]

122. In addition to no longer following the 2019 memo, adopting a secret policy to ignore Fourth Amendment rights, and dismantling the Office for Civil Rights and Civil Liberties and Office of the Ombudsman, DHS has departed from three prior policies limiting the use of facial recognition technology against observers and protesters.

123. In September 2023, then-DHS Deputy Under Secretary for Management Randolph Alles issued DHS Directive 026-11, "Use of Face Recognition and Face Capture Technologies."[8] The directive explicitly stated that the agency "does not use [facial recognition or facial capture] technologies to profile, target, or discriminate against any individual solely for exercising their Constitutional rights or to enable systemic, indiscriminate, or wide-scale monitoring, surveillance, or tracking."[9] The directive guaranteed U.S. citizens the right to opt out of facial recognition for non-law enforcement uses "unless otherwise authorized or required."[10] It also set up an oversight system—including the Chief Privacy Officer, the Office for Civil Rights and Civil Liberties, and

---

[7] *Id.*
[8] Dep't of Homeland Sec., DHS Directives System, Directive 026-11, Use of Face Recognition and Face Capture Technologies (2023), https://perma.cc/BTG6-BTQN.
[9] *Id.* at 5.
[10] *Id.* at 6.

the Chief Information Officer—to review new and existing uses of facial recognition technology.[11] The directive no longer appears on DHS's website and a 2024 report on DHS's use of facial recognition technology related to that directive has been archived.[12]

124. As of September 2023, Defendant DHS also had a policy limiting the collection of photos for use in facial recognition technologies in contexts like participation at events protected by the First Amendment, including protests. As of that same date, a training for HSI staff instructed that staff may not collect photos based solely on an individual's participation in a noncriminal organization or event protected by the First Amendment. Neither policy appears to still be actively implemented.

125. In a 2021 Privacy Impact Assessment, DHS acknowledged that new enhancements to its technology—including the addition of geographic searches and photographic data collection—created a risk that DHS agents would collect license plate reader information extrinsic to any authorized DHS investigation.[13] That year, DHS directed officers not to "record any information or images of . . . individuals if they are not relevant to an investigation," not to scan large areas, and imposed regular audits to ensure "adherence to the program requirements."[14]

126. Before launching its aggressive deportation campaign, DHS repealed Directive 026-11 and other policy and training guardrails on the use of facial recognition and license plate reader technology in sensitive First Amendment contexts. DHS also effectively dismantled its Office for Civil Rights and Civil Liberties, which previously reviewed DHS policies and programs

[11] *Id.* at 4.
[12] Dep't of Homeland Sec., *2024 Update on DHS's Use of Face Recognition & Face Capture Technologies* (Jan. 16, 2025), https://perma.cc/L8KK-8WQM.
[13] Dep't of Homeland Sec., *Privacy Impact Assessment for the Acquisition and Use of License Plate Reader (LPR) Data from a Commercial Service*, No. DHS/ICE/PIA-039(b), at 11-15 (2021), https://perma.cc/N2HJ-FEGZ.
[14] *Id.* at 13-14.

to ensure respect for constitutional rights.[15] Defendants chose to replace these safeguards with new policies aimed at dissuading legal observers from exercising their constitutional rights.

**B. Defendants have established the Intimidation and Retaliation Policy allowing federal agents to target constitutional observers.**

127. Through a string of executive orders, memoranda, public statements, and persistent refusals to investigate abuses of authority, President Trump, DHS, DOJ, and FBI leadership have established a policy that authorizes and encourages federal agents to threaten and punish legal observers by labeling them "violent rioters," "criminals," and even "domestic terrorists."

128. Since the summer of 2025, federal agents across the country have responded to constitutional observers with physical force and intimidation, carrying out their policy of retaliation. Instead of investigating these agents for abuses of power, Defendants and other senior administration officials have repeatedly ratified and justified that behavior.

129. In executive orders, memoranda, and public statements, Defendants have repeatedly told their agents and the public that individuals documenting the activities of federal law enforcement, among other things, are "violent rioters" and "domestic terrorists." Those documents, in turn, authorize agents to respond to "domestic terrorism" with force, intimidation, and suppression.

130. One of the principal legal euphemisms deployed in permitting use of force against legal observers is the concept of "doxxing." Doxxing is a form of harassment that involves publicly exposing someone's private information, such as their name, address, job, or other identifying information, without their consent. Defendants have used this concept to conflate observing law enforcement with actual violence or interference with federal law enforcement by labeling it a tool

---

[15] José Olivares, *Court records reveal gutting of DHS oversight: 'Incredibly dangerous'*, The Guardian (Mar. 8, 2026), https://perma.cc/E4XT-Y3Y9.

of domestic terrorism. By doing so, Defendants have expressly adopted the view that observing and recording federal agents in public is a threatening, "violent," and criminal act. As such, Defendants' policy allowing DHS officials to retaliate against "violent protesters" and "domestic terrorists" allows federal agents to retaliate against and suppress constitutional observers simply because they are recording federal agents in their communities.

131. In June 2025, DHS issued an internal bulletin titled "Recent Anti-Law Enforcement Tactics Used in Unlawful Civil Arrest." Decl. of Ryan Shapiro in Supp. of Pls.' Prelim. Inj., Ex. A, *L.A. Press Club v. Mullin*, No. 2:25-cv-5563 (C.D. Cal. July 18, 2025), ECF No. 34-19. That bulletin identified "use of cameras"; "livestreaming . . . interactions [with officers]"; following officers to their "vehicles, offices, and hotels"; "doxxing"; and videorecording as "unlawful civil unrest" tactics and "threats" to federal law enforcement officers. *Id.* The bulletin also listed observers' use of "social media" "to get more people involved in their ideological movements" and "share videos" as a threat to federal law enforcement. *Id.* at 2-3. To counter these "tactics," DHS instructed officers to "observe and report on individuals" engaged in the "discreet use of cameras" or "note taking[.]" *Id.* at 3.

132. In a July 12, 2025 press conference, former DHS Secretary Kristi Noem said that "videotaping" federal agents "where they're at when they're out on operations" was "violence" that "threaten[ed]" ICE officers "and their safety."[16] In a later interview, then-Secretary Noem said reporting on the location of immigration enforcement agents was illegal because it "is actively encouraging people to avoid law enforcement activities and operations."[17]

---

[16] Forbes Breaking News, *Kristi Noem Claims Videotaping ICE Agents is 'Violence' Following Camarillo, California Farm Raids*, at 00:15-30 (YouTube, July 14, 2025), https://www.youtube.com/watch?v=uDFX4q6huH8.

[17] Edward Helmore, *Trump is waging war against the media – and winning*, The Guardian (July 5, 2025), https://perma.cc/RB89-VENV.

133. In another interview, DHS Assistant Secretary for Public Affairs Tricia McLaughlin told the Center for Media and Democracy that "videotaping ICE law enforcement and posting photos and videos of them online is doxing our agents[.]" McLaughlin added: "We will prosecute those who illegally harass ICE agents to the fullest extent of the law."[18]

134. On September 22, 2025, President Trump issued an executive order designating "Antifa" a "domestic terrorist organization" and directing federal law enforcement to target persons engaged in a nationwide "campaign of violence and terrorism" that expressly included "routine doxing of and other threats against political figures and activists." Exec. Order No. 2025-18709, 90 Fed. Reg. 46317 (Sep. 22, 2025).

135. A few days later, the President issued a National Security Presidential Memorandum titled "Countering Domestic Terrorism and Organized Political Violence." NPSM-7, 90 Fed. Reg. 47225 (Sep. 25, 2025). In it, the President accused an organized set of "anti-fascist" "domestic terrorists" of engaging in "violent conduct" animated by "anti-Americanism, anti-capitalism, and anti-Christianity; support for the overthrow of the United States Government; extremism on migration, race, and gender; and hostility towards those who hold traditional American views on family, religion, and morality." 90 Fed. Reg. at 47225-26. The President authorized federal law enforcement agencies—including the National Joint Terrorism Task Force run by the FBI—to create a new comprehensive national strategy to investigate and prosecute cases of "domestic terrorism." 90 Fed. Reg. at 47226. NSPM-7 expressly defines "politically motivated terrorist acts" to include "organized doxing campaigns, swatting, rioting, looting, trespass, assault, destruction of property, threats of violence, and civil disorder." 90 Fed. Reg. at 47226-27.

---

[18] Matthew Cunningham-Cook, *DHS Claims Videotaping ICE Raids is 'Violence'*, The Am. Prospect (Sep. 9, 2025), https://perma.cc/WAS7-FRN6.

136. In a December 4, 2025 memorandum that operationalizes NSPM-7, then-Attorney General Pam Bondi directed federal law enforcement to use all available investigative tools to aggressively combat "rampant criminal conduct rising to the level of domestic terrorism," including "organized doxing of law enforcement, mass rioting and destruction in our cities, violent efforts to shut down immigration enforcement, targeting of public officials or other political actors," and "impeding" immigration enforcement.[19] Bondi identified several viewpoints the Administration associates with domestic terrorism, "including opposition to law and immigration enforcement."[20]

137. In May 2026, "[f]or the 25th Anniversary of the 9/11 terror attacks," the White House announced that "America has returned to a common sense and reality-based Counterterrorism Strategy."[21] In his forward on the strategy, President Trump explained, "[a]s part of my commitment to defending America from all enemies, foreign and domestic, we are once again working to crush the threat of terrorism." The strategy identifies "Violent Left-Wing Extremists, including Anarchists and Anti-Fascists" as one of three key domestic terrorist organizations.

138. Courts have already concluded that Defendants use the concept of "doxxing" to systematically disregard the rights of observers who monitor and videotape immigration enforcement operations. In September 2025, the United States District Court for the Central

[19] Memorandum from Att'y Gen. Pam Bondi to all federal prosecutors, law enforcement agencies, & DOJ Grantmaking Components, Implementing Nat'l Sec. Presidential Mem.-7 Countering Domestic Terrorism and Organized Pol. Violence at 1-3 (Dec. 4, 2025), https://www.documentcloud.org/documents/26371599-bondi-memo-on-countering-domestic-terrorism-and-organized-political-violence-1/ ("Dec. 2025 AG Memo").
[20] *Id.* at 2.
[21] The White House, U.S. Counterterrorism Strategy at 3, 5, 16 (2026), https://perma.cc/6M7S-DG6T.

District of California found that an "avalanche of evidence . . . suggests that federal agents acted pursuant to a common and widespread practice of violating the First Amendment rights of journalists, legal observers, and protestors." *L.A. Press Club v. Noem*, 799 F. Supp. 3d 1036, 1067 (C.D. Cal. 2025). In January 2026, the same court found plausible allegations that DHS had adopted a policy "to treat photography and videorecording of DHS officers in public as 'threats' or 'doxxing' that DHS officers may respond to with force and address as crimes." *L.A. Press Club v. Noem*, 820 F. Supp. 3d 1034, 1047-48 (C.D. Cal. 2026).

139. In addition, Defendants have started applying 18 U.S.C. § 111—which imposes a criminal penalty on anyone who "forcibly assaults, resists, opposes, impedes, intimidates, or interferes" with federal law enforcement—to peaceful legal observation and protest.

140. On September 29, 2025, then-Attorney General Pam Bondi issued a memorandum establishing an "ICE Protection Task Force" that directs U.S. Attorney's Offices nationwide to prosecute "any individual who assaults or forcibly impedes or intimidates these officers, who interferes with the performance of these officers' official duties, or who attempts to do so, consistent with 18 U.S.C. § 111 and other applicable federal laws."[22] The Attorney General further specified that "[t]he charging priorities directed by this memorandum are not limited to those criminals who are caught red-handed committing acts of violence against ICE facilities and personnel[,]" instead extending to "every person who aids, abets, or conspires to commit these crimes, whether through funding, coordination, planning, or other means."[23]

---

[22] Memorandum from Att'y Gen. Pam Bondi to Dirs. of FBI, AFT, U.S. Marshals, DEA, and Exec. Office of U.S. Att'ys, Ending Pol. Violence Against ICE at 2 (Sep. 29, 2025), https://www.justice.gov/ag/media/1415691/dl.

[23] *Id.* at 3.

141. In her December 2025 memo, then-Attorney General Bondi identified a litany of criminal statutes for prosecutors to consider when charging perceived "domestic terrorists" "[t]o the maximum extent permitted by law[.]"[24] The memo encourages prosecutors to be "particularly mindful" of their ability to charge alleged "domestic terrorists" under 18 U.S.C. § 111 for impeding federal officers.[25]

142. In furtherance of NSPM-7 and the December 2025 Attorney General Memo, in January 2026, FBI Director Kash Patel announced that he had opened an investigation into Signal group text chats that Minnesota constitutional observers were using to share information about federal immigration agents' movements in their communities.[26] Director Patel said "that sort of Signal chat—being coordinated with individuals not just locally in Minnesota, but maybe even around the country—if that leads to a break in the federal statute or a violation of some law, then we are going to arrest people."[27] Patel also said the FBI had made "substantial progress" in investigating these groups and alleged that protests and constitutional observation were "not happening organically."[28]

143. Activists, parents, neighborhood watch, and constitutional observers have widely used Signal group chats to facilitate their constitutionally protected observation of federal agents in their communities.[29]

144. In January 2026, Associate Deputy Attorney General Aakash Singh laid out NSPM-7 as DOJ's basis for prosecuting anyone who dissented from the Administration's deportation

---

[24] Dec. 2025 AG Memo at 3.
[25] *Id.*
[26] David Ingram, *The FBI is investigating Minnesota Signal chats tracking ICE, Patel says*, NBC News (Jan. 26, 2026), https://perma.cc/2BXS-6999.
[27] *Id.*
[28] *Id.*
[29] *Id.*

agenda.[30] He directed coordinators at U.S. Attorney's Offices around the country to "hound[]" federal agents to make cases, promising headlines for indictments.[31] Federal prosecutors acted pursuant to this directive, initially bringing hundreds of 18 U.S.C. § 111 charges against individual dissenters[32] before shifting to broad conspiracy charges against groups of dissenters, including the Broadview 6 and Minneapolis 15.[33]

145. In response to Singh's directives, on January 28, 2026, DHS and the U.S. Attorney's Office for the District of Minnesota jointly initiated "Operation Puppet Master," a mass spying campaign directed at protestors and ICE watch networks, to identify and charge those engaging in First Amendment-protected-activity.[34] Alongside "Operation Puppet Master," DHS opened "Project Whipple Shield" to surreptitiously gather information on organizations in Minneapolis engaged in constitutional observation and mass organizing.[35]

146. Also in furtherance of Defendants' national policies and directives, in January 2026, a DHS official sent a memorandum to HSI agents assigned to Minnesota, asking them to "capture all images, license plates, identifications, and general information on hotels[], agitators, protestors, etc., so we can capture it all in one consolidated form." The form is titled "intel collection non-

---

[30] Alan Feuer, Alexandra Berzon & Ernesto Londoño, *'Go Big and Go Loud': Inside the Justice Dept.'s Push to Prosecute Protesters*, N.Y. Times (Mar. 19, 2026), https://www.nytimes.com/2026/03/19/us/politics/justice-dept-prosecute-protesters.html
[31] *Id.*
[32] Ted Hesson, Kristina Cooke & Brad Heath, *ICE is cracking down on people who follow them in their cars*, Reuters (Feb. 10, 2026), https://www.reuters.com/world/us/ice-is-cracking-down-people-who-follow-them-their-cars-2026-02-10/.
[33] Indictment, *United States v. Rabbitt*, No. 1:25-cr-00693 (N.D. Ill. Oct. 23, 2025), ECF No. 1; Indictment, *United States v. Sant*, No. 0:26-cr-00115 (D. Minn. June 11, 2026), ECF No. 1.
[34] Def.'s Mot. for Disc. Under Rule 16 & *Brady/Giglio* at 18, *United States v. Sant*, No. 0:26-cr-00115 (D. Minn. Aug. 13, 2026), ECF No. 212.
[35] *Id.* at 5, 18.

arrests," indicating that it is used to record information about individuals who have not been arrested for criminal activity.[36]

147. Federal agents in Chicago also implemented a federal policy to retaliate against peaceful constitutional observers based on the theory that documenting law enforcement activity itself advocates for "violence" and qualifies as an act of "domestic terrorism." *See Chicago Headline Club v. Noem*, 810 F. Supp. 3d 842, 860-62 (N.D. Ill. 2025), *opinion vacated*, *appeal dismissed*, 168 F.4th 1033 (7th Cir. 2026). For example, in litigation over the use of force in Chicago, federal agents claimed they had video evidence showing that agents faced constant danger from cars purposefully ramming into them. *Id.* But as the court found, videos suggested "that the agent drove erratically and brake-checked other motorists in an attempt to force accidents that agents could then use as justifications for deploying force." *Id.* at 861. Videos also revealed agents treating cars that were safely following them as potential threats and threatening the drivers for observing law enforcement activities. *Id.* at 862 n.8. On multiple occasions, witnesses in Chicago reported seeing agents taking pictures and videos of constitutional observers. *Id.* at 885.

148. Defendants' repeated official memoranda and public statements have made clear that individuals engaged in peaceful constitutional observation should be investigated, arrested, prosecuted, and otherwise retaliated against for exercising their First Amendment rights.

### C. Defendants wield immense power to investigate constitutional observers and abuse information collected through their investigative tools, fueling their Intimidation and Retaliation Policy.

149. As Plaintiffs and other constitutional observers have experienced, DHS agents routinely photograph and record constitutional observers and their license plates. *See supra* Part

[36] Winter & Alvarez, *supra* note 1.

III.B. Federal agents do so to identify constitutional observers and use their personal information to track and dissuade them from exercising their First Amendment rights.

150. It has been widely reported that DHS officers use a mobile application, Mobile Fortify, to scan peoples' faces.[37] According to an internal email sent to all ERO personnel, "[t]he Mobile Fortify App empowers users with real-time biometric identity verification capabilities utilizing contactless fingerprints and facial images captured by the camera on an ICE[-]issued cell phone without a secondary collection device[.]"[38] Officers using the Mobile Fortify app can search across multiple databases, including CBP's Traveler Verification Service, to verify an individual's citizenship.[39] Mobile Fortify stores photographs for future use and location information so agents "can identify where the encounter took place."[40] CBP retains that data in the Automated Targeting System—another DHS database linked to the Traveler Verification Service—for 15 years.[41] DHS does not allow individuals to opt out of having their faces scanned during interactions with law enforcement agents.[42]

151. Federal agents also collect information on constitutional observers using license plate readers. DHS's mobile application allows officers to photograph license plates and retrieve information, including a vehicle's historical sightings, registered owner, associated addresses,

---

[37] Joseph Cox, *ICE and CBP Agents Are Scanning Peoples' Faces on the Street to Verify Citizenship*, 404 Media (Oct. 29, 2025), https://perma.cc/344Y-6GWN.
[38] Joseph Cox, *ICE Is Using a New Facial Recognition App to Identify People, Leaked Emails Show*, 404 Media (June 26, 2025), https://perma.cc/3HSC-VGMD.
[39] The Traveler Verification Service allows CBP to take photos of people's faces, compare that image to a bank of 200 million images, and then obtain information such as the individual's name, date of birth, nationality, alien number, and whether they have an outstanding deportation order. *See* Joseph Cox, *You Can't Refuse to Be Scanned by ICE's Facial Recognition App, DHS Document Says*, 404 Media (Oct. 31, 2025), https://perma.cc/P5JJ-D962.
[40] *Id.*
[41] *Id.*; Dep't of Homeland Sec., Mobile Fortify Privacy Threshold Analysis, at 7 (2025), https://www.documentcloud.org/documents/26209262-mobile-fortify-pta/?ref=404media.co.
[42] Cox, *supra* note 39.

"linked individuals," and "patterns of repeated travel."[43] ICE also has access to several private sector camera networks, allowing the agency to view and search "license plate sightings gathered from police cruisers, fixed cameras, toll plazas, commercial parking systems, and private contributors."[44] The most infamous of these is Flock. Flock has Automatic License Plate Reader cameras in "more than 5,000 communities across the country."[45] Flock cameras "continuously record the plates, color, and brand of vehicles passing in front of them."[46] Officers can use the nationwide Flock network to see where a vehicle (and its driver) were at a certain time or map the driver's prior movements over a longer period.[47]

152. While facial recognition and license plate reader technologies form the front end of DHS's investigative system, the data agents collect in the field are synthesized alongside a wider set of databases the Federal government already maintains. CBP and other agencies within DHS feed "evidence" of "domestic terrorism" and other information they capture about observers into the "Intelligence Reporting System – Next Generation," or IRS-NG.[48] According to DHS's 2025 privacy impact assessment, IRS-NG incorporates a wide range of government databases and allows users to search those systems simultaneously. Dep't of Homeland Sec., Privacy Impact Assessment for the Intelligence Reporting System-Next Generation, at 4 (2025). IRS-NG includes "data from the combination of license plate [and] Department of Motor Vehicle (DMV) registration

---

[43] Anthony Kimery, *ICE's license plate app quietly expands a nationwide surveillance web*, Biometric Update.com (Nov. 18, 2025), https://www.biometricupdate.com/202511/ices-license-plate-app-quietly-expands-a-nationwide-surveillance-web.
[44] *Id.*
[45] Jason Koebler & Joseph Cox, *ICE Taps into Nationwide AI-Enabled Camera Network, Data Shows*, 404 Media (May 27, 2025), https://www.404media.co/ice-taps-into-nationwide-ai-enabled-camera-network-data-shows/.
[46] *Id.*
[47] *Id.*
[48] Ken Klippenstein, *Feds Identify "Leader of Antifa"*, Ken Klippenstein (Feb. 2, 2026), https://www.kenklippenstein.com/p/feds-identify-leader-of-antifa.

data" and "certain law enforcement and/or intelligence data, reports, and projects developed by CBP users that may include public source information." *Id.* at 5.

153. At the same time, DHS increasingly looks to the private sector for new ways to collect and synthesize large amounts of data about political dissenters, including legal observers. ICE's access to private sector data allows the agency to view "driver records, address history, vehicle registration information, family and associate linkages,"[49] phone numbers, social media activity, credit header data from Experian, marriage records, voter registration, and more.[50] ICE also has access to Tangles, a software that can detect faces online and builds dossiers of a person's internet history that can include social media posts, contacts, and locations and events attended.[51] The agency similarly can access Webloc, a cellphone database that allows users to track the movements of specific phones.[52] And ICE has access to Fivecast, which provides a tool that scrapes data from "news streams, search engines, social media, marketplaces, [and] the dark web" to build a "digital footprint" of an individual and assign them a "level of risk."[53]

154. DHS has invested in its hardware capacity too. For years, the agency has steadily purchased "Cell Site Simulator (CSS) Vehicles to support the Homeland Security Technical Operations program." Cell site simulators mimic cell towers, drawing phones within their range to connect as if they were looking for cell phone signals. The technology gives law enforcement the

[49] Kimery, *supra* note 43.
[50] Joseph Cox, *This App Lets ICE Track Vehicles and Owners Across the Country*, 404 Media (Nov. 17, 2025), https://perma.cc/GS3N-FVBS.
[51] Thomas Brewster, *ICE Just Spent Millions on Surveillance Tech Banned By Facebook*, Forbes (Sep. 18, 2025), https://www.forbes.com/sites/thomasbrewster/2025/09/18/ice-spends-millions-on-social-media-spy-tech-banned-by-meta-facebook/.
[52] *Id.*
[53] Cooper Quintin, *ICE Is Going on a Surveillance Shopping Spree*, Elec. Frontier Found. (Jan. 7, 2026), https://perma.cc/3HRJ-5B6Y.

ability to better triangulate the location of connected phones and their owners. Some cell site simulators can also intercept phone calls, text messages, and internet traffic.[54]

155. Finally, DHS has reactivated a contract with Paragon, a spyware company, for a hacking software called Graphite that can effectively take control of an individual's phone.[55] Using Graphite, ICE can track an individual's location, read their messages, look through their photographs, access encrypted applications like WhatsApp or Signal, and turn the user's phone into a listening device by manipulating the phone's recorder.[56]

156. Federal agents use these wide-ranging investigative tools to identify observers and add them to "domestic terrorist" watchlists, yet another powerful tool to track and discourage First Amendment activity.

157. Officials at DHS, DOJ, ICE, and CBP have repeatedly confirmed the existence of a legal observer watchlist, composed of personal information accessible to federal agents through a web of government databases.

158. In January 2026, President Trump's "border czar" Tom Homan told Fox News: "One thing I'm pushing for right now . . . we're going to create a database where those people that are arrested for interference, impeding[,] and assault, we're going to make them famous[.]"

---

[54] Lorenzo Franceschi-Bicchierai, *ICE bought vehicles equipped with fake cell towers to spy on phones*, TechCrunch (Oct. 7, 2025), https://perma.cc/ZN38-LXNR.

[55] Jack Poulson, *Exclusive: ICE reactivated its $2 million contract with Israeli spyware firm Paragon, following its acquisition by U.S. capital*, Substack: All-Source Intelligence (Sep. 1, 2025), https://perma.cc/C9WD-QRRV; Stephanie Kirchgaessner, *ICE obtains access to Israeli-made spyware that can hack phones and encrypted apps*, The Guardian (Sep. 2, 2025), https://perma.cc/LCL9-SFPK.

[56] Kirchgaessner, *supra* note 55.

Another senior administration official told journalists that DHS and DOJ are tracking "aggressive protesters." This designation includes observers who document federal immigration officers.[57]

159. In June 2026, Homan again confirmed that DHS was using facial recognition in the field. Homan told reporters, "[w]e've got facial recognition of people from Portland and many from Minnesota" and suggested DHS has used that data to confirm that several protesters were from out of state.[58]

160. Two ICE officials, speaking on the condition of anonymity, told *Reuters* in February 2026 that "ICE has been tracking the names of protestors in an internal database for several months." That government database contains names, photos, actions that provoked suspicion, locations, and license plates for constitutional observers who have interacted with DHS officials. The officials said that "the effort was intended to spot patterns that could lead to charges." In January 2026, "ICE was referring several people per day in Minnesota alone to federal prosecutors for potential charges" under 18 U.S.C. § 111.[59]

161. Three current and former DHS officials confirmed that ICE has deployed facial recognition technologies to "track citizens who have protested ICE's presence."[60]

162. Two senior national security officials told journalist Ken Klippenstein that there are more than a dozen watchlists that DHS and the FBI use to track protesters, "Antifa," and other purported "domestic terrorists." These watchlists—a set of databases and applications—were built for various purposes, including to create "social media repositor[ies]" and "link people on the

[57] Ken Klippenstein, *Exclusive: ICE's Secret Watchlists of Americans*, Ken Klippenstein (Jan. 28, 2026), https://perma.cc/J6GK-JSYR.
[58] Aaron Rupar (@atrupar), X (June 8, 2026), https://perma.cc/EPP9-ZNRR.
[59] Hesson, Cooke & Heath, *supra* note 32.
[60] Sheera Frenkel & Aaron Krolik, *How ICE Already Knows Who Minneapolis Protestors Are*, N.Y. Times (Jan. 31, 2026), https://www.nytimes.com/2026/01/30/technology/tech-ice-facial-recognition-palantir.html.

streets together" to collect information on "friends and families who have nothing to do with any purported lawbreaking." Among other functions, the watchlists' databases and applications process tips, situation reports, and photographs and videos submitted from the public and agents in the field. Federal law enforcement agencies use that information to create a "common operating picture" in a given city; "link individuals together through geographic proximity or what is labeled 'call chaining' by processing telephone numbers, emails, and other contact information"; and target individuals for investigation and arrest.[61]

163. Another anonymous federal law enforcement official stated that DHS has ordered immigration officers to "gather identifying information about anyone filming them and to send that information to Intel[,] who will do a 'work-up' on them[.]"[62]

164. Several examples of these work-ups have since become public, demonstrating Defendants' ability to develop a full picture of an individual's online presence, physical movements, and personal associations.

165. Journalist Ken Klippenstein accessed a DHS intelligence report about Chandler Patey, who DHS identifies as "the leader of Antifa in Portland, OR." The report includes Mr. Patey's home address and describes his apartment as a "safe house" for protestors. The report also explains that Mr. Patey "was identified through open-source research as an active participant in the protests." The report does not identify any additional criteria that triggered Mr. Patey's inclusion in the DHS intelligence system.[63]

---

[61] Ken Klippenstein, *Exclusive: ICE's Secret Watchlists of Americans*, Ken Klippenstein (Jan. 28, 2026), https://perma.cc/Q4PP-ASWB.
[62] Ken Klippenstein, *ICE Making a List of Anyone Who Films Them*, Ken Klippenstein (Jan. 23, 2026), https://perma.cc/8LZK-WL9W (internal quotations omitted).
[63] Ken Klippenstein, *Feds Identify "Leader of Antifa"*, Ken Klippenstein (Feb. 2, 2026), https://perma.cc/X9L9-SPAW.

166. In another report, DHS describes Dustin Ragsdale as an "Antifa protestor" identified through "open-source research." DHS knows that Mr. Ragsdale "lives across the street from [an] ICE Detention Center" and is allegedly "aggressive to counter protesters." According to DHS, "[f]urther research is currently being conducted on this individual."[64]

167. By suing to unseal the record in her criminal case, Marimar Martinez found that DHS produced a similar report about her just five days before ICE Officer Charles Exum shot her four times and high-ranking government officials attempted to brand her as a "domestic terrorist."[65]

168. The net effect of this technological system is startling. With ease, DHS can identify observers on the streets of any major city and assemble a complete picture of their online presence, physical movements, and intimate associations. That permeating federal presence creates a heightened risk for observers added to "domestic terrorist" watchlists and, by its operation, chills constitutionally protected speech.

169. Because all these actions are in furtherance of Defendants' Intimidation and Retaliation Policy, neither DHS nor DOJ have investigated or reprimanded any agents for the unconstitutional conduct Plaintiffs are experiencing.

## III. Defendants have implemented their Intimidation and Retaliation Policy against constitutional observers.

170. Once Defendants have identified constitutional observers, they intimidate and retaliate using: (1) threats of force and arrest; (2) knowledge of observers' own personal information to intimidate them; (3) actual force; (4) criminal charges; and (5) administrative

[64] *Id.*
[65] Ruby Cramer, *Shot By Border Patrol, Then Called A "Domestic Terrorist"*, The New Yorker (Mar. 12, 2026), https://perma.cc/D6LB-X2R5.

penalties.

171. Faced with this retaliation, reasonable constitutional observers, including Plaintiffs, have and will refrain from engaging in protected expression, creating a substantial chilling effect that is both immediate and irreparable.

**A. Defendants retaliate against constitutional observers with threats**.

172. Defendants' agents carry out their Intimidation and Retaliation Policy against constitutional observers through threats of force and criminal charges, as demonstrated by the following examples across the country.

173. Defendants often threaten force against constitutional observers through the aggressive use of their vehicles. Defendants engage in otherwise illegal driving maneuvers to surround and trap legal observers.

174. On August 10, 2026, Carolina Molina, a U.S. citizen and Northern Virginia resident, was visiting immigration law offices, where she volunteers as a licensed professional counselor. She noticed DHS agent activity as she pulled into the parking lot, which her vehicle's dashcam captured. As Ms. Molina attempted to leave the parking lot, unmarked vehicles positioned themselves in front of and behind her vehicle, effectively boxing her in. Masked ICE agents then emerged from the vehicles and approached her car. One agent had drawn his firearm and pointed it directly at Ms. Molina before shouting at her for "following" and "recording" them. Then the ICE agent accused her of attempting to run the agents over and threatened her with arrest. The video showed that she had never followed nor threatened them in any way.[66]

175. On April 21, 2026, Common Cause member 3 observed an ICE facility in Salisbury,

---

[66] Billal Rahman & Dan Gooding, *US Citizen Calls ICE 'Unhinged' After Agent Points Gun at Her*, Newsweek (Aug. 12, 2026), https://www.newsweek.com/video-shows-ice-agent-pointing-gun-at-us-citizen-in-virginia-falls-church-12312508.

Maryland, from a nearby public parking lot. They sat in their car during this observation and spent time silently meditating. Two DHS vehicles pulled in behind their car, blocking them into the public lot. The DHS agents then got out of their vehicle. Common Cause member 3 got out of their vehicle because they are aware that people have been accused of using their vehicles as weapons towards DHS and did not want to be similarly accused. Common Cause member 3 felt trapped by DHS agents' vehicles and frightened by their decision to block their exit or anyone else's entrance into the public lot.

176. On December 30, 2025, Benjamin Reese was driving down a residential street in Memphis, Tennessee, with his roommate when he saw flashing blue lights up ahead and noticed a dark, unmarked car on the side of the road with a state trooper and local police. Decl. of Benjamin Reese at 4-6, *Demster v. Blanche*, No. 2:26-cv-02546 (W.D. Tenn. May 28, 2026), ECF No. 16-57 ("Reese Decl."). Mr. Reese and his roommate drove past the scene and pulled over to observe the agents' activity. *Id.* They were 75 feet away. *Id.* The agents then began to drive away, so Mr. Reese and his roommate did too, although in a different direction. *Id.* Shortly after they resumed driving, they noticed a police vehicle following them. *Id.* Mr. Reese and his roommate began to document the interaction on Facebook Live. *Id.* They pulled over into a gas station and the police vehicle blocked them in with its lights turned on. *Id.* A local cop got out of the cruiser and walked up to Mr. Reese's vehicle with a second officer wearing green fatigues and pseudo-tactical gear labeled "SPECIAL AGENT." *Id.* The agents told Mr. Reese and his roommate that it would be illegal to try and "halt" officers from doing their job. *Id.* They suspected this was a reference to the roommate's last name, which is Halt. *Id.*

177. Days later, on January 3, 2026, Mr. Reese, his roommate, and another observer were in a car when they saw a state trooper and an unmarked car conducting a traffic stop in Memphis.

Reese Decl. at 7. They pulled over and observed the stop from across the street. *Id.* After the stop ended, they followed the vehicles about 100 feet behind before losing sight of them. *Id.* A state trooper then drove past them in the opposite direction, made a U-turn, and began following the observers. *Id.* A second state trooper and the unmarked vehicle also began following them shortly after, doing so for 10 minutes before the observers pulled into the parking lot of a strip mall. *Id.* The observers stopped their vehicle and got out to avoid a confrontation with the agents. *Id.* They went inside a McDonald's and waited until the agents left. *Id.*

178. On December 7, 2025, John Biestman and his wife, Janet Lee, heard that ICE vehicles were circling a church in their Minneapolis neighborhood. Decl. of John Biestman at 1, *Tincher v. Mullin*, No. 25-CV-04669 (D. Minn. Dec. 17, 2025), ECF No. 1-2 ("Biestman Decl."). They "drove to the church to observe and document ICE activity[] and to express [their] strong disapproval" of federal immigration agents detaining individuals as they left church. *Id.*; *see also* Decl. of Janet Lee at 1, *Tincher v. Mullin*, No. 25-cv-04669 (D. Minn. Dec. 17, 2025) ECF No. 1-3 ("Lee Decl."). When the pair arrived, they saw ICE vehicles driving around the church and started following one of the vehicles at a distance. Biestman Decl. at 1. They followed the vehicle into a park near the church where four unmarked vehicles appeared and boxed the couple in. *Id.* Several masked, unidentified federal agents surrounded Mr. Biestman and Ms. Lee's vehicle, pointed semiautomatic weapons at them, threatened to arrest them, and recorded their faces and license plate with their phones. Lee Decl. at 2-3. One agent told the couple: "We have your license plate; we now know where to find you." Biestman Decl. at 2. Eventually, a masked ICE agent came to the driver's side window and told Mr. Biestman and Ms. Lee that they had to leave, warning them not to follow ICE officers again. *Id.* Ms. Lee described the incident as "traumatic"

and says she has "been more cautious" while acting as a legal observer "because [she] fear[s] that ICE agents will physically harm" her for exercising her First Amendment rights. Lee Decl. at 4.

179. On October 24, 2025, Hunter Demster was at a library near a school at the end of the school day in Memphis. Decl. of Hunter Demster at 7, *Demster v. Blanche*, No. 2:26-cv-02546 (W.D. Tenn. May 28, 2026), ECF No. 16-49 ("Demster Decl."). He started filming members of the Memphis Safe Task Force congregating in the parking lot. *Id.* President Trump established the Task Force to send federal agents to the city and ensure collaboration with state police. *See generally* Compl. at 9-16, *Demster*, No. 2:26-cv-02546 (W.D. Tenn. May 13, 2026), ECF No. 1. As Mr. Demster started filming the Task Force, a state trooper said, "You guys gonna go to jail for interfering. I suggest you back on that way." Demster Decl. at 7-8. Shortly after, the Task Force agents dispersed to at least six different unmarked vehicles to leave the parking lot. *Id.* at 8. Mr. Demster stood near a grassy median filming the vehicles' exit when an unmarked black Ford Expedition, driven by an unidentified and masked agent, sped up and swerved within two inches of him before braking and then driving away. *Id.*

180. On October 4, 2025, Jordyn Gualdani, a Memphis journalist, was traveling around the city to observe and document federal agents' activities with other journalists. Decl. of Jordyn Gualdani at 5, *Demster v. Blanche*, No. 2:26-cv-02546 (W.D. Tenn. May 28, 2026), ECF No. 16-56 ("Gualdani Decl."). The observers saw a swarm of agents and vehicles surrounding another vehicle in a gas station parking lot, so they pulled over and walked towards the gas station. *Id.* at 5-6. They saw multiple federal agents from HSI, the U.S. Marshals Service, the FBI, and the Drug Enforcement Agency. *Id.* at 6. The agents were about to break the window of a vehicle they had pulled over. *Id.* But when the observers arrived, the agents said to "leave it" and walked away. *Id.* at 6-7. Mr. Gualdani got back in his car and noticed he was having difficulty connecting his camera

to his iPhone. *Id.* at 7. His phone was connected to a network he did not recognize. *Id.* Another journalist with him that night was having similar issues. *Id.* at 8. He believes they were targeted by a cell site simulator. *Id.* After this incident, Mr. Gualdani was the target of several incidents of agents following him and bumper rushing his vehicle, meaning that federal agents positioned their truck behind Mr. Gualdani's vehicle on the road and accelerated so that he believed they were about to hit him. *Id.* at 8-10. These incidents seriously frightened Mr. Gualdani and intimidated him. *Id.* at 10.

181. On October 1, 2025, Leslie Cortez drove to a Home Depot in Cicero, Illinois, where she heard federal immigration agents were targeting day laborers in her community. Decl. of Leslie Cortez at 1, *Chi. Headline Club v. Noem*, No. 1:25-cv-12173 (N.D. Ill. Oct. 21, 2025), ECF No. 73-13 ("Cortez Decl."). Ms. Cortez stood next to her parked car, advising two men of their rights in Spanish while she filmed agents arresting them. *Id.* As she did so, a CBP agent drove his vehicle up to Ms. Cortez, got out, and aimed a firearm at her so she "could see inside the barrel." *Id.*; *Chi. Headline Club*, 810 F. Supp. 3d at 954. Ms. Cortez told the agent she had the right to protest and observe, prompting him to put down his gun and drive away. Cortez Decl. at 1. Ms. Cortez testified that the experience left her "traumatized" because she "never had a weapon drawn at her . . . for documenting and for witnessing." *Chi. Headline Club*, 810 F. Supp. 3d at 954. Ms. Cortez now "questions her safety when she goes out," "thinks twice about documenting and observing every single day," and fears she might be hurt while she observes federal law enforcement. *Id.*

182. On October 10, 2025, Jo-Elle Munchak was driving home when she noticed federal agents blocking a vehicle and questioning a landscaper in her Chicago neighborhood. Decl. of Jo-Elle Munchak ¶¶ 2-4, *Chi. Headline Club v. Noem*, No. 1:25-cv-12173 (N.D. Ill. Oct. 21, 2025), ECF No. 77-1 ("Munchak Decl."). She pulled over, parked several feet away from the officers'

vehicles to avoid obstructing their movement, and recorded the interaction. *Id.* ¶¶ 5-8. After federal agents detained the landscaper, Ms. Munchak stopped recording and proceeded home. *Id.* ¶¶ 10-13. While she was driving, however, Ms. Munchak noticed that the agents she had just recorded were following her. *Id.* ¶¶ 14-18. As Ms. Munchak turned onto a street leading to her home, federal agents in two SUVs boxed in her car. *Id.* ¶¶ 17-18. Multiple agents then exited their vehicles, surrounded Ms. Munchak, demanded she get out of her vehicle, pounded on her windows, and tried to open her locked car doors while one agent stood in front of the car with a gun pointed at Ms. Munchak's head. *Id.* ¶¶ 19-21. Ms. Munchak explained that she was driving home and held up her driver's license to prove that she lived close by. *Id.* ¶¶ 22-24. An officer took a picture of Ms. Munchak's license and the vehicle identification number of her car. *Id.* ¶ 24. Meanwhile, another federal agent told Ms. Munchak, "[w]e'll let you go this time, but next time you'll be detained." *Id.* The agents then left and Ms. Munchak drove home. *Id.* ¶¶ 24-25. Ms. Munchak said: "I am now afraid and hesitant to record law enforcement officers again. I'd like to think that I would do so, but after this experience I am afraid of what might happen." *Id.* ¶ 26.

183. On October 10, 2025, Tara Goodarzi heard federal agents were present near her Chicago neighborhood. *Chi. Headline Club*, 810 F. Supp. 3d at 955. Ms. Goodarzi drove to observe the agents' actions and saw several parked in an alley parking lot. *Id.* at 955. Within a few minutes of her arrival, the agents left the parking lot and Ms. Goodarzi followed. *Id.* Suddenly, the agents angled their vehicles to box in her car. *Id.* at 955-56. Three agents, one carrying a semiautomatic weapon, got out and approached her. *Id.* at 956. Ms. Goodarzi presented her identification upon request and an agent took a photograph of her face. *Id.* The agents then warned Ms. Goodarzi that, if she continued following them, they would detain her for impeding their operations. *Id.*

184. On September 18, 2025, Arely Barrera learned that federal immigration agents were conducting operations near her neighborhood in Northwest Chicago. Decl. of Arely Barrera at 1, *Chi. Headline Club v. Noem*, No. 1:25-cv-12173 (N.D. Ill. Oct. 21, 2025), ECF No. 73-12 ("Barrera Decl."). Ms. Barrera drove to where the agents were operating and took photographs "to create greater accountability for ICE actions" and "to convey that [the agents] were being watched and would be held responsible for any constitutional or other legal violations." *Id.* When agents saw Barrera taking photographs, they drove their car behind Barrera's, trapping her in her parking space. *Id.* The agents then aggressively approached her car and photographed and filmed her with their phones. *Id.* Ms. Barrera said the officers' aggression scared her and that she is "afraid to record ICE and other federal immigration law enforcement agents based on how I was treated." *Id.*

185. Defendants' retaliation against constitutional observers also involves threatening criminal charges, such as arrest, prosecution, and inclusion on a domestic terrorist watchlist.

186. In October 2025, a woman in Waukegan, Illinois, filmed a Border Patrol agent telling her, "If you continue to follow us around and monitor us like this, we will take you out and arrest you . . . . I'm just warning you."[67]

187. In a video posted to X on November 18, 2025, a legal observer filmed Border Patrol agents who stopped her for following and honking at them. The agents told the observer, "Stop following us," adding, "If you impede on our duties, you will be arrested."[68]

---

[67] David J. Bier, *The Government Unconstitutionally Labels ICE Observers as Domestic Terrorists*, CATO Inst. (Dec. 15, 2025), https://www.cato.org/blog/dhs-policy-threatening-arresting-ice-observers-violates-their-rights.

[68] Kim "Katie" USA (@KimKatieUSA), X (Nov. 18, 2025), https://x.com/KimKatieUSA/status/1990870146442031297.

188. On October 8, 2025, Border Patrol agents in Waukegan, Illinois, told a legal observer sitting in her car: "Either you get out or we're going to get you out." After the observer told the agents she was following them to "warn people," one of the Border Patrol agents told the observer: "This is your one and last warning. If you keep impeding us, we will stop you, pull you out, and arrest you."[69]

189. In a video posted to X on December 7, 2025, a constitutional observer recorded a group of ICE agents in Richfield, Minnesota, telling him to "stop obstructing" federal agents. The observer calmly told the officers, "I'm not obstructing, I'm observing." Still, the officers yelled at the man, "This is your one and only warning, sir; next time you will be arrested for impeding." The officers added, "One more time [and] you're going to jail."[70]

190. In 2025 in New Orleans, Louisiana, ICE agents were recorded stopping a legal observer and telling her she was impeding them. The observer asked, "How am I impeding you? Because I'm recording?" The officer responded, "This is your one and only warning. If you impede, we will arrest you."[71]

191. In another 2025 incident filmed near Chicago, Illinois, Border Patrol agents told a legal observer following them in a car: "This is your first warning. You only get two, and then you're going to be arrested for interfering." The legal observer protested that she was "just driving around in [her neighborhood]." But the agents responded: "No, you're harassing us[;] you're following."[72]

---

[69] Bier, *supra* note 67.

[70] JT Cestkowski (@JTCestkowski), X (Dec. 7, 2025), https://x.com/JTCestkowski/status/1997748578207596718.

[71] Bier, *supra* note 67.

[72] *Id.*

192. DHS agents also threatened constitutional observers with arrest under a specific statute, 18 U.S.C. § 111, that covers assaulting, resisting, or impeding a federal officer. These threats are connected to the December 2025 Attorney General Memo's directive to federal prosecutors to be "particularly mindful" of considering charges under Section 111[73] and Assistant Attorney General Aakash Singh's January 2026 directive to new coordinators at each United States Attorney's Office to "hound" federal agents to make cases.[74] Following and recording DHS agents is not enough for criminal liability under Section 111. Indeed, DOJ's criminal resource manual clearly states that "[f]orce is an essential element" of the crime of impeding an officer.[75] Yet observers around the country continue to experience specific threats of prosecution under Section 111.

193. On November 10, 2025, in Carpinteria, California, federal agents stopped a legal observer and told him, "[i]t is a federal crime for you to be interfering with us." When the observer asked the officer to describe how he was interfering with their actions, the agents told him to "[s]top following us" and cited "18 U.S.C. 111."[76]

194. In Slidell, Louisiana, Customs and Border Patrol agents were recorded pulling over a legal observer, citing "18 U.S.C. 111," and taking a photo of the observer's face using their smartphones.[77]

195. On October 21, 2025, in Skokie, Illinois, two Border Patrol agents pulled over a legal observer for following and recording them. The agents cited 18 U.S.C. § 111 multiple times

---

[73] Dec. 2025 AG Memo at 3.
[74] Alan Feuer, Alexandra Berzon & Ernesto Londoño, *'Go Big and Go Loud': Inside the Justice Dept.'s Push to Prosecute Protesters*, N.Y. Times (Mar. 19, 2026), https://www.nytimes.com/2026/03/19/us/politics/justice-dept-prosecute-protesters.html.
[75] Bier, *supra* note 67.
[76] *Id.*
[77] *Id.*

and warned the observer: "If you follow us again, I will pull you out of the vehicle and arrest you."[78]

196. On multiple occasions, federal agents have called or coordinated with state and local police to interfere with legal observers and threaten them with criminal charges.

197. In San Diego, California, federal agents called 911 and requested assistance from San Diego police after community members gathered at an apartment complex to document an ongoing immigration operation. Local police responded and separated legal observers from federal agents while the federal agents took photographs of license plates of cars parked in the complex parking lot and arrested three legal observers.[79]

198. In a video posted to X in November 2025, California local police can be seen detaining a legal observer for following and honking at federal agents.[80]

199. In another video, a legal observer recorded local police stopping her behind a Border Patrol vehicle and telling her she was not allowed to follow federal agents.[81]

**B. Defendants retaliate against constitutional observers by collecting and using their own personal information to intimidate them.**

200. In furtherance of their Intimidation and Retaliation Policy, Defendants deter and chill speech by collecting observers' information and using it to intimidate them. This retaliatory conduct includes calling observers by their names, despite never having been introduced; leading observers' to or arriving at observers' home unannounced; and stating that DHS agents will add

---

[78] *Id.*; *see also* Richard Requena, *Immigration agents threatened to arrest Skokie woman for filming them, she told Board*, Chi. Trib. (Oct. 27, 2025), https://www.chicagotribune.com/2025/10/27/immigration-agents-threatened-to-arrest-skokie-woman-for-filming/.

[79] *Citizens arrested while documenting ICE activity freed after night in port of entry cells*, Daylight San Diego (July 4, 2025), https://perma.cc/EB99-VEVV.

[80] Bier, *supra* note 67; Kim "Katie" USA (@KimKatieUSA), X (June 29, 2025), https://x.com/KimKatieUSA/status/1939344356164706573.

[81] Bier, *supra* note 67.

observers to a "domestic terrorist" watchlist, as demonstrated by the following examples across the country.

201. On November 11, 2025, Hunter Demster observed Task Force agents in Memphis putting a young Hispanic woman in the back of an unmarked truck. Demster Decl. at 12. Mr. Demster left the scene shortly thereafter, returning home about three blocks away. *Id.* He then saw a local police officer—whom he recognized from the officer's frequent appearances on local news as the Memphis Police Department's Hispanic Liaison Officer—drive by Mr. Demster's house, look at him, and grin before driving away. *Id.* On two other occasions, about two weeks later, Mr. Demster observed vehicles, with tinted windows and out-of-state license plates typical of federal agents, idling near his home. *Id.* at 13-14. Mr. Demster felt terrified and no longer safe in his own home. *Id.*

202. On December 17, 2025, Mr. Demster observed and filmed Task Force agents for about five minutes before returning to his car to leave. Demster Decl. at 19. As he did so, a federal agent drove by Mr. Demster, saying "Good job, Hunter" over the vehicle's loudspeaker. *Id.* at 19-20. On December 23, 2025, as Mr. Demster walked up to observe Task Force activity, an HSI agent whom Mr. Demster had never met before said, "Oh hey, Hunter." *Id.* Task Force agents' continued use of Mr. Demster's name has made him feel like a target and made him question whether he should continue observing and documenting Task Force activities. *Id.* at 21.

203. On December 7, 2025, Riley Kellermeyer was following an SUV that other legal observers had reported as an ICE vehicle in South Minneapolis when a second SUV with tinted windows and Indiana plates started tailgating her. Decl. of Riley Kellermeyer at 1, *Tincher v. Mullin*, No. 25-cv-04669 (D. Minn. Dec. 17, 2025), ECF No. 1-11. Nervous, Mrs. Kellermeyer let the second SUV pass and decided to drive home. *Id.* But when Mrs. Kellermeyer arrived, the two

SUVs were "pulled up next to [her] house like they were waiting for [her]." *Id.* Feeling "intimidated and vulnerable," Mrs. Kellermeyer drove past the ICE agents to a nearby shopping center to wait in a public place; the agents followed. *Id.* at 1-2. While Mrs. Kellermeyer was turning into the parking lot, one of the SUVs cut in front of her. *Id.* The driver, a masked ICE agent, rolled down her window and screamed at Mrs. Kellermeyer to "stop fucking following them," that she was "impeding" the agents, and that this would be her "one and only warning" before the agents would arrest her. *Id.* at 2. The agent repeated herself before the two SUVs drove away. *Id.*

204. On January 5, 2026, after multiple encounters with agents while engaging in constitutional observation, Benjamin Reese and his roommate were driving toward their home in South Memphis when they saw a vehicle with Colorado plates and tinted windows parked directly in front of the house. Reese Decl. at 7-8. Mr. Reese had noticed unmarked vehicles around their home more than once and neighbors had told Mr. Reese and his roommate that they had seen federal agents casing the house. *Id.* After multiple reports of these vehicles, Mr. Reese and his roommate installed a security camera. *Id.* They noticed that these unmarked vehicles typically parked directly outside or across the street from their home for 30 minutes or longer, which Mr. Reese believes is intended to intimidate him, his roommate, and his neighbors, who are predominately Black. *Id.* at 8.

205. In January 2026, after the murder of Renee Good, DHS agents filmed and threatened to prosecute Common Cause member 1 for their constitutional observation in Minneapolis. DHS agents also appeared near Common Cause member 1's home and place of employment. These experiences were threatening enough that Common Cause member 1 feared for their safety and that of their family, renting an Airbnb for several days thereafter.

206. On January 10, 2026, Nicole Cleland was following an "ICE/CBP" vehicle in her neighborhood in Richfield, Minnesota, as a legal observer with a local community group. Decl. of Nicole Cleland at 1, *Tincher v. Mullin*, No. 25-cv-04669 (D. Minn. Jan. 21, 2026), ECF No. 98 ("Cleland Decl."). Suddenly, the agent stopped, blocking Ms. Cleland's path forward, and approached Ms. Cleland's vehicle. Cleland Decl. at 2. The agent addressed Ms. Cleland as "Nicole," even though they had never met before, and informed Ms. Cleland that he had facial recognition technology and that his body camera was recording. *Id.* The agent told Ms. Cleland that she was "impeding their work" and if she was "found to be impeding again, [she] would be arrested." *Id.* at 3. The agent then returned to his vehicle and drove away. *Id.*

207. On January 19, 2026, Benjamin Reese went to his usual coffee shop in Memphis. Reese Decl. at 9. He noticed a black vehicle parked outside and could see a man inside the vehicle wearing full tactical gear and a vest that said HSI. *Id.* Mr. Reese told the coffee shop employees that there was a federal agent parked outside. *Id.* A woman a few feet away in plainclothes left the coffee shop and got into the vehicle, which then parked directly in front of Mr. Reese's vehicle. *Id.* Mr. Reese believed the agents had followed him to the coffee shop and was extremely anxious after this incident. *Id.*

208. On January 13, 2026, David Burns drove to a shopping center near his home in West St. Paul, Minnesota, where he noticed two agents wearing vests with the ICE logo sitting in the shopping center's parking lot. Decl. of David Burns at 2, *Tincher v. Mullin*, No. 25-cv-04669 (D. Minn. Feb. 13, 2026), ECF No. 136-10. Mr. Burns parked several parking spots away to observe the ICE agents, but when the agents noticed Mr. Burns, they became agitated and started insulting him. *Id.* Mr. Burns recorded the agents briefly, then put down his phone and began to drive away. *Id.* at 3. As Mr. Burns left the parking lot, the ICE agents pulled up next to him and

one yelled: "We'll see you on County Road B." *Id.* County Road B is the street Mr. Burns lives on in Roseville, Minnesota. *Id.* Mr. Burns felt the agents were trying to tell him that they knew where he lived. *Id.* Since that interaction, Mr. Burns has noticed ICE agents parked outside of his home and has stopped monitoring ICE agents for fear of retaliation. *Id.* at 4.

209. On January 17, 2026, Connor Fradenburgh drove to a grocery store in Burnsville, Minnesota, after receiving a report that federal immigration officers were seen in the area. Decl. of Connor Fradenburgh, *Tincher v. Mullin*, No. 25-cv-04669 (D. Minn. Feb. 13, 2026), ECF No. 136-24. When Mr. Fradenburgh arrived, he saw two masked men in an unmarked ICE vehicle driving around the parking lot. *Id.* at 2. After a few minutes, the ICE vehicle left the parking lot and Mr. Fradenburgh followed from a distance. *Id.* at 3. During the drive, the agent in the passenger seat appeared to take a picture of Mr. Fradenburgh's license plate. *Id.* After a brief stop at a service station, the agents drove to Mr. Fradenburgh's parents' home, where another agent in a black SUV was already waiting. *Id.* at 2-4. As Mr. Fradenburgh drove past, the agent in the black SUV smiled, waved, and started following Mr. Fradenburgh. *Id.* at 4. Meanwhile, the lead ICE vehicle briefly stopped in front of Mr. Fradenburgh parents' home and then turned around at the end of the cul-de-sac. *Id.* Mr. Fradenburgh understood that the agents were trying to intimidate him by leading him to his parents' home and later said that the incident "frightened" him and caused him "anxiety and difficulty sleeping." *Id.* at 4.

210. On the evening of January 26, 2026, Emily Beltz was driving around her neighborhood in Edina, Minnesota, "to conduct legal observations of federal agent activity" when she received a notification that federal agents were sitting in a car parked outside of a nearby apartment building. Decl. of Emily Beltz at 2-3, *Tincher v. Mullin*, No. 25-cv-04669 (D. Minn. Feb. 13, 2026), ECF No. 140. Mrs. Beltz drove to the apartment building and met with several

other legal observers in the building's parking lot, where they noticed an unmarked federal immigration vehicle. *Id.* at 3. Mrs. Beltz and the other legal observers started "honking and whistling to let people in the apartment building know that federal agents were present and to protest agents' activities." *Id.* When the agents left the parking lot, Mrs. Beltz and other legal observers followed at a safe distance until the agents pulled into another parking lot. *Id.* The agents stopped abruptly and one agent leaned out of the unmarked car to take a photo of Mrs. Beltz. *Id.* Mrs. Beltz decided to leave, but before she could the agents turned around and sped toward her, stopping just before impact. *Id.* A masked female agent leaned out of the SUV again and yelled, "Emily, Emily we're going to take you home." *Id.* The woman repeated Mrs. Beltz's name several more times and then yelled her home address. *Id.* Mrs. Beltz was scared for her family and felt the agents had told her, in effect, that they knew where she lived and "could come and get [her] and [her] family at anytime." *Id.*

211. During ICE's operations in Maine in January 2026, Liz McLellan drove to an elementary school bus stop near her home after community members noticed an ICE agent parked nearby. Ms. McLellan followed the agent as she left the bus stop, occasionally honking her horn to alert her neighbors. To Ms. McLellan's surprise, the agent drove straight to her home. The agent got out of her car and walked to Ms. McLellan with her smartphone out, as if she was filming the conversation. She then told Ms. McLellan: "This is a warning. We know you live right here[.]" Meanwhile, other agents arrived at the scene and started recording a bystander who was filming Ms. McLellan's interaction with the first agent. When the agents left, McLellan called 911 and told the dispatcher that she was scared and that federal officers had intimidated her at her home.[82]

[82] Callie Ferguson, *'We know you live right here,' ICE agents tell Maine woman who followed them*, The Me. Monitor (Jan. 22, 2026), https://perma.cc/454F-4JHU.

212. On January 21, 2026, Elinor Hilton received an alert through a community Signal group that a possible immigration operation was happening at a Home Depot near her home in South Portland, Maine. *See* Compl. at 12, *Hilton v. Mullin*, No. 2:26-cv-00092 (D. Me. Feb. 23, 2026), ECF No. 1 ("*Hilton* Compl."); Decl. of Elinor Hilton at 1-2, *Hilton v. Mullin*, No. 2:26-cv-00092 (D. Me. Feb. 23, 2026), ECF No. 3-1 ("Hilton Decl."). Upon arriving at the Home Depot, Ms. Hilton saw several federal agents arresting an individual. *Hilton* Compl. at 12. Ms. Hilton parked several rows away from the nearest agent, exited her vehicle, and started recording the agents with her phone. *Id.* Less than a minute later, an agent approached Ms. Hilton and used his phone to capture Ms. Hilton's face, vehicle, and license plate. *Id.* When Ms. Hilton moved to capture better footage of the arrest, the agent drove his car to block her view, took out his phone, and resumed filming Ms. Hilton's face. *Id.* at 12-13. Soon after, another agent approached Ms. Hilton and started filming her face. *Id.* The first agent then told Ms. Hilton: "I hope you know that if you keep coming to things like this, you are going to be on a domestic terrorist watchlist. Then we're going to come to your house later tonight." *Id.* As more agents and observers arrived at the scene, the agents repeatedly reiterated that they were taking photos of Ms. Hilton and another legal observer to add Ms. Hilton and another observer to a "domestic terrorist watchlist." *Id.* at 14-15.

213. On January 23, 2026, Colleen Fagan noticed two large black vehicles she thought were federal agents parked in an apartment complex in her neighborhood in Maine. *Hilton* Compl. at 8. Ms. Fagan parked her car several car lengths away from the agents' vehicles and started recording the vehicles out of a "general desire to document immigration enforcement activity," and "hold agents accountable for any unlawful conduct." *Id.* at 8. Immediately after she began recording, two federal agents walked toward Ms. Fagan and recorded her face and license plates with their phones. *Id.* at 8, 10. As one of the agents turned away from Ms. Fagan's vehicle, she

asked, "Why are you taking my information down?" *Id.* at 10. The agent responded: "Cause we have a nice little database. And now you're considered a domestic terrorist, so have fun with that." *Id.*

214. On February 25, 2026, Kenneth Halt received a text from his neighbor with a picture of three vehicles parked near his home in Memphis. Decl. of Kenneth Halt at 19, *Demster v. Blanche*, No. 2:25-cv-02546 (W.D. Tenn. May 28, 2026), ECF No. 16-51 ("Halt Decl."). He opened the app on his phone connected to the camera on his front door and confirmed that a white pickup truck, black SUV, and gray sedan were parked on his street. *Id.* All three vehicles had tinted windows and appeared to have out-of-state license plates, while the driver of the white truck appeared to be wearing a tactical vest. *Id.* at 19-20. The camera's footage showed the three vehicles arrived together and sometimes repositioned themselves on the street to talk through their vehicles' open windows. *Id.* at 20. At no point did the agents appear to get out of their vehicles. *Id.* at 21. However, after their arrival, Mr. Halt's front door camera inexplicably cut out and was down for about five minutes. *Id.* Once it came back online, the camera was facing straight down, rather than towards the street, and was turning from left to right. *Id.* After two other instances of suspicious vehicles idling on his quiet residential street, *id.* at 17-18, and at least one instance where a federal agent appeared to reference his name, *id.* at 14, Mr. Halt lives in fear that Task Force agents may be waiting somewhere nearby to arrest or harm him when he returns home. *Id.* at 21.

215. On July 8, 2026, Common Cause member 5 was observing multiple vehicles believed to be associated with DHS in Dover, New Jersey. When they parked and approached the vehicles to view their license plates, one of the vehicles used its speaker system to announce Common Cause member 5's full name. Later, on July 26, 2026, Common Cause member 6 followed a suspected ICE vehicle. As they did so, Common Cause member 6 noticed that the

vehicle was driving into their neighborhood. The vehicle then turned down a street that led to a cul-de-sac and Common Cause member 6's house. The vehicle remained in the cul-de-sac for a few minutes before leaving.

216. On August 28, 2026, Common Cause member 7 started to film DHS agents detaining people in their New Jersey community. DHS agents then called Common Cause member 7 by their full name and asked if they wanted a visit from one of DHS's investigators before announcing their full home address.

### C. Defendants use force to intimidate and retaliate against constitutional observers.

217. To further retaliate against constitutional observers, Defendants maintain a practice of using excessive force against them, as demonstrated by the following examples across the country.

218. On or about May 28, 2026, while Common Cause member 4 used their phone to film ICE and DHS agents at Delaney Hall in Newark, New Jersey, an agent grabbed Common Cause member 4's shoulder from behind, flipped them onto the ground, removed their goggles, and pepper sprayed them directly in the face and eyes. Agents then grabbed Common Cause member 4 and dragged them inside Delaney Hall. Once inside, the agents took Common Cause member 4's phone and wallet, which contained identifying information, including a driver's license. Agents searched through their wallet without their consent. A DHS agent then initiated what Common Cause member 4 felt was an odd conversation meant to determine in real time who was at fault. Barely able to see and under duress, Common Cause member 4 held their phone up to the agent to view the recorded interaction and demonstrate that Common Cause member 4 was not the aggressor. After viewing Common Cause member 4's video, the agent conferred with other agents and proceeded to release Common Cause member 4. Before being released, the agent told

Common Cause member 4 it was possible charges could be filed against them later. Defendants' excessive use of force against Common Cause member 4 is documented in the following photo:



219. On October 4, 2025, Eduardo Guillen was volunteering as a "peaceful observer" of federal immigration agents in Chicago's Brighton Park neighborhood. He remained on the sidewalk, away from the agents, and did not provoke them. Without warning and without issuing a dispersal order, Border Patrol agents drove by and pepper-sprayed Mr. Guillen where he stood, "severely impact[ing]" his vision and ability to breathe.[83]

[83] Madison Savedra, *5 People Sue Border Patrol Agents Over Use Of Tear Gas, Unlawful Detention During Midway Blitz*, Block Club Chi. (July 2, 2026), https://perma.cc/Z4YA-ZMM2.

220. That same day, attorney Jennifer Lydia Crespo was volunteering as a legal observer during federal immigration enforcement operations in Chicago's Brighton Park neighborhood. Compl. at 2, *Crespo v. John Doe U.S. Border Patrol Agents*, No. 26-cv-07730 (N.D. Ill. July 1, 2026), ECF No. 1. Ms. Crespo assisted Chicago Police Department officers with crowd control of a peaceful protest, encouraging protesters to remain on the sidewalks away from CBP agents. *Id.* Without warning and without issuing a dispersal order, those agents deployed tear gas and flashbang grenades into the crowd, shooting a tear gas canister "within feet" of Ms. Crespo, although she was merely observing the agents' actions. *Id.* The tear gas and flashbangs caused Ms. Crespo to have difficulty seeing and breathing. *Id.* at 3.

221. On October 28, 2025, Jessica Chodor arrived at a Task Force traffic stop in Memphis after learning that a Hispanic couple who had been pulled over needed someone to drive their vehicle home. Decl. of Jessica Chodor at 9, *Demster v. Blanche*, No. 2:26-cv-02546 (W.D. Tenn. May 28, 2026), ECF No. 16-50 ("Chodor Decl."). Ms. Chodor approached a state trooper and asked him if the couple needed any help. *Id.* He informed her that they did not and instructed her to go back to her car several times. *Id.* at 9-10. Instead, Ms. Chodor crossed the street. *Id.* at 10-11. The trooper approached her, along with an unidentified federal agent, and grabbed her arm. *Id.* at 11. After Ms. Chodor told him not to touch her and that her phone was recording and being broadcast to social media, he tackled her to the ground. *Id.* The trooper and federal agent then pinned her face down, putting their weight on her back so that she struggled to breathe. *Id.* They shouted that she was about to be tased and ordered her to give them her right arm, which was pinned underneath her body, making it impossible to comply. *Id.* The two then arrested and detained Ms. Chodor for 27 hours. *Id.* at 11-12, 14. The Task Force agents charged her with resisting official detention, which was later dropped. *Id.* at 15.

222. On November 6, 2025, in Chicago, Jose Dominguez noticed two cars with Border Patrol agents inside and began recording them from his own car. The agents stopped their vehicles and approached Mr. Dominguez. When Mr. Dominguez told the agents he was a U.S. citizen, the agents physically ripped him out of his car and "viciously slammed" him to the ground. They choked him, kneed him, handcuffed him, and detained him. The agents had injured Mr. Dominguez so severely that he needed to be treated at a hospital upon his release.[84]

223. In July 2026, Linda Wolff was in the Inwood neighborhood of New York City when she heard that DHS agents were making arrests nearby, so she took out her phone to start recording. As Ms. Wolff stood on the curb recording the agents, the agents walked over and sprayed her with pepper spray.[85]

224. In extreme cases, Defendants have discharged firearms against legal observers. These actions threaten the lives of legal observers, who are peacefully and legally monitoring federal law enforcement.

225. On October 4, 2025, Marimar Martinez left her home in Chicago to donate old clothes and shoes to a nearby church. On her way to the church, Ms. Martinez saw a truck with tinted black windows, a Kentucky license plate, and a light-up Uber decal on the front windshield, which she recognized as signs of a disguised ICE vehicle. Ms. Martinez followed the vehicle, honking her horn and shouting "La migra! [The immigration police!]" out of her window. She also livestreamed the interaction on Facebook.[86] Footage inside the truck shows ICE Agent Charles Exum driving and two other agents in the back seat. Exum could hear Ms. Martinez shouting and,

---

[84] Savedra, *supra* note 83.
[85] Melissa Colorado, *72-year-old woman says she was hit with pepper spray while recording ICE agents in Manhattan*, NBC News (Aug. 17, 2026), https://perma.cc/SUK6-V34H.
[86] Cramer, *supra* note 65.

when he looked in his mirror, saw her phone raised at his vehicle. Body camera footage reveals that the agents became increasingly agitated as Ms. Martinez and several other drivers honked at the agents and alerted the community of their presence. Abruptly, Agent Exum yanked his steering wheel to the left and collided with Ms. Martinez. Agent Exum got out of his car with his gun drawn.[87] Within seconds, Agent Exum shot Ms. Martinez five times. After Ms. Martinez regained consciousness at the hospital, federal agents informed her that she was being charged with assaulting, impeding, and interfering with a law enforcement officer.[88]

226. Defendants rushed to paint Ms. Martinez as a violent domestic terrorist. DHS Assistant Secretary for Public Affairs Tricia McLaughlin posted that Martinez was "armed with a semi-automatic weapon" and "rammed" into the agents.[89] The post was misleading: Ms. Martinez had a registered firearm in her purse, snapped shut inside a holster.[90] DHS also issued a press release describing Ms. Martinez as a "domestic terrorist" "with a history of doxxing federal agents."[91] DHS's mention of "doxxing" references the fact that Ms. Martinez was recording Agent Exum just before he shot her and demonstrates the impact of Defendants' policy.

227. Prosecutors dropped all charges against Ms. Martinez hours before defense attorneys were expected to reveal new texts from Agent Exum about the shooting.[92] But even after

---

[87] *Id.*
[88] *Id.*
[89] *Id.*
[90] Maggie Dougherty, *Judge rules to release evidence in Border Patrol shooting of Marimar Martinez*, NPR Ill. (Feb. 6, 2026), https://perma.cc/DZ3P-24L8.
[91] Press Release, Dep't of Homeland Sec., *UPDATE: DHS Deploys Special Operations After Multiple Violent Attacks on Federal Law Enforcement by Domestic Terrorists in Chicago* (Oct. 4, 2025), https://perma.cc/SKV2-CD3C.
[92] Madison Savedra, *Feds Drop Charges Against Woman Shot By Border Patrol In Brighton Park*, Block Club Chi. (Nov. 20, 2025), https://blockclubchicago.org/2025/11/20/feds-drop-charges-against-woman-shot-by-border-patrol-in-brighton-park/.

the dismissal, DHS and its top officials continued calling Ms. Martinez a "domestic terrorist."[93] Those statements pushed Ms. Martinez to sue to release the evidence in her case publicly so she could correct an "unyielding tide of misinformation from the federal government[.]" Mot. to Modify the Ct.'s Protective Order at 2, *United States v. Martinez*, 1:25-cr-00636 (N.D. Ill. Jan. 26, 2026), ECF No. 100. When the Federal government released those records pursuant to a court order, Ms. Martinez learned that a CBP intelligence team shared a dossier that included her name, picture, and social media account with agents in Chicago five days before Agent Exum shot her.[94] The CBP intelligence told the agents that Ms. Martinez's information had been verified with a DHS database.[95]

228. On January 7, 2026, Renee Good and her wife Becca Good were driving in their car with their dog when they came across federal immigration agents in their Minneapolis neighborhood.[96] The couple stopped "to observe with the intention of supporting and helping their neighbors."[97] Videos from the scene show Renee and Becca Good filming and talking to ICE agents.[98] ICE officer Jonathan Ross also recorded the interaction, including Renee Good's face and license plate.[99] While Agent Ross positioned himself in front of Ms. Good's vehicle, a masked

---

[93] Melody Mercado, *Federal Judge Orders Release of Evidence In Case of Woman Shot 5 Times By Border Patrol*, Block Club Chi. (Feb. 9, 2026), https://blockclubchicago.org/2026/02/06/federal-judge-orders-release-of-evidence-in-case-of-woman-shot-5-times-by-border-patrol/.
[94] Cramer, *supra* note 65.
[95] *Id.*
[96] Michael Loria, *'Beautiful light of our family': Renee Good's family reveals new details about morning she was killed by ICE*, USA Today (Jan. 14, 2026), https://perma.cc/MKQ5-7PVR.
[97] *Id.*
[98] Michael Feinberg, *Before and After the Trigger Press That Killed Renee Good*, Lawfare (Jan. 14, 2026), https://perma.cc/R5QD-FBVM.
[99] Zoe Sottle, Allsha Ebrahimji & Karina Tsul, *911 transcripts, incident reports and videos show how an ICE agent shot a mother of 3 at 'point blank range'*, CNN (Jan. 17, 2026), https://perma.cc/2KZN-V4ZB.

officer approached the driver side window yelling at her to "get out of the fucking car."[100] Ms. Good attempted to back her car up, turn her car away from Ross, and drive past him.[101] But before she could pass, Agent Ross shot Ms. Good three times at close range.[102] Ms. Good died at a nearby hospital an hour after the shooting.[103]

229. After Renee Good's death, Defendants wrongfully accused Ms. Good of being a "violent rioter" and "domestic terrorist." At a press conference hours after the shooting and before any investigation of what occurred, then-DHS Secretary Noem declared Ms. Good had committed an "act of domestic terrorism" and accused her of attacking the agents on scene with her car.[104] In the same vein, DHS Assistant Secretary for Public Affairs Tricia McLaughlin posted on social media that Ms. Good was a "violent rioter" who committed "an act of domestic terrorism" by trying to run over a federal officer with her vehicle.[105] Then-Secretary Noem later accused Ms. Good of "stalking and impeding" ICE officials all day by "'blocking them in' with her car and 'shouting at them.'"[106] Then-Secretary Noem's mention of "stalking and impeding" is an apparent

---

[100] *Id.*
[101] *See id.*; Bellingcat (@bellingcat.com), Bluesky (Jan. 9, 2026), https://bsky.app/profile/did:plc:sb54dpdfefflykmf5bcfvr7t/post/3mbzglg3ids24?ref_src=embed&ref_url=https%253A%252F%252Fwww.bellingcat.com%252Fnews%252F2026%252F01%252F13%252Fanalysing-footage-of-minneapolis-ice-shooting%252F.
[102] Elaine Tassy, *Lawyers for Renée Good's family say federal agencies not cooperating with request for information*, CPR News (Mar. 11, 2026), https://www.cpr.org/2026/03/11/renee-good-lawsuit-federal-cooperation/.
[103] Sottle, Ebrhaimji & Tsul, *supra* note 99.
[104] FOX 9 Minneapolis-St. Paul, *Kristi Noem calls actions leading up to fatal ICE shooting 'act of domestic terrorism'*, at 0:05 (YouTube, Jan. 7, 2026), https://www.youtube.com/watch?v=GPVpHDyOXCM.
[105] Tricia McLaughlin (@TriciaOhio), X (Jan. 7, 2026), https://x.com/triciaohio/status/2008957179793998266?s=46.
[106] Tiffany Wertheimer, *Who was Renee Nicole Good, the woman killed by ICE?*, BBC (Jan. 13, 2026), https://perma.cc/BLU4-7PMM.

reference to the fact that Ms. Good was exercising her First Amendment right to observe federal law enforcement in her community when she was killed.

230. Shortly after Ms. Good's death, senior federal prosecutors opened a standard civil rights investigation—in collaboration with the FBI and the Minnesota Bureau of Criminal Apprehension—into Agent Ross's use of deadly force.[107] But before they could execute a search warrant to collect evidence from Ms. Good's vehicle, senior officials, including FBI Director Kash Patel, directed the investigation to cease.[108] Then-Acting Attorney General Todd Blanche confirmed that the DOJ and FBI would not investigate Ms. Good's fatal shooting, saying "We investigate when it's appropriate to investigate and that is not the case here."[109]

231. As experiences across the country demonstrate, Defendants' agents act pursuant to a policy authorizing them to retaliate against constitutional observers, even when they do not pose an immediate threat to federal agents.[110] Senior officials in the Administration have encouraged and defended even the most aggressive and blatantly unconstitutional instances of retaliation.

232. The day after Good was killed, Vice President JD Vance appeared to justify Ms. Good's killing in part because she was "part of a broader left-wing network to attack, to dox, to

---

[107] Ernesto Lodoño, *Prosecutors Began Investigating Renee Good's Killing. Washington Told Them to Stop.*, N.Y. Times (Feb. 7, 2026), https://www.nytimes.com/2026/02/07/us/renee-good-investigation-minnesota-trump.html.

[108] *Id.*

[109] Robert Mackey, *Justice department 'not investigating' Renee Good killing in contrast to 2020 inquiry on George Floyd death*, The Guardian (Jan. 18, 2026), https://perma.cc/BV7E-XQ53.

[110] DHS also plans for its agents to begin using gloves that can deliver painful electric shocks in 2027. These gloves, called Generated Low Output Voltage Emitters, look like regular black, padded gloves, but when the wearer presses a small button on the glove's wrist, it delivers an electric shock. As one officer put it, "In today's society, you know, everybody's filming everything, everybody has a cell phone . . . , but the glove is low optic, and it looks better on video, and it looks better to those witnesses. With a glove, there are no burn marks or scars." Sophie Hurwitz, *The Orwellian Company Behind ICE's New Electric Shock Gloves*, Mother Jones (Aug. 15, 2026), https://perma.cc/B2VD-7ZE4 (internal quotation marks omitted).

assault and to make it impossible for our ICE officers to do their job." Vance further argued that the media "ought to tell the truth that a group of left-wing radicals have been working tirelessly, sometimes using domestic terror techniques to try to make it impossible for the [P]resident of the United States to do what the American people elected him to do, which is enforce our immigration laws." He went on to say, "I can believe that [Good's] death is a tragedy while also recognizing that it's a tragedy of her own making and a tragedy of the far left who has marshaled an entire movement – a lunatic fringe – against our law enforcement officers."[111] President Vance's mention of "doxxing" appears to reference constitutional observers' efforts to observe federal agents in public.

233. A week after Ms. Good's death, DHS retweeted a clip of Stephen Miller, White House Deputy Chief of Staff, encouraging ICE agents to act with a sense of impunity. In the clip, Mr. Miller says: "To all ICE officers: You have federal immunity in the conduct of your duties. Anybody who lays a hand on you, or tries to stop you, or tries to obstruct you is committing a felony."[112]

**D. Defendants retaliate against constitutional observers using criminal charges.**

234. In furtherance of their policies, Defendants subject legal observers to unwarranted criminal investigations, including arrests, detentions, and prosecution. Despite frequent arrests of

---

[111] Henry J. Gomez, *Vance says death of Minnesota woman killed by ICE was 'a tragedy of her own making'*, NBC News (Jan. 8, 2026), https://www.nbcnews.com/politics/trump-administration/vance-says-death-minnesota-woman-killed-ice-was-tragedy-making-rcna253063.

[112] *DHS shares Stephen Miller clip telling ICE they have 'federal immunity'*, FOX9 KMSP (Jan. 14, 2026), https://www.fox9.com/news/trump-adviser-stephen-miller-tells-ice-have-federal-immunity-when-dealing-protesters.

legal observers for purported crimes, these legal observers are rarely convicted of any wrongdoing. This form of retaliation is evidenced by the following examples across the country.

235. On January 29, 2026, Becky Ringstrom was watching federal immigration officers as they sat in their parked car in her neighborhood in the Minneapolis suburbs. When the agents started to move, Mrs. Ringstrom decided to follow from a safe distance. At a roundabout, a CBP agent approached Mrs. Ringstrom's car and said, "Last time I'm going to warn you." Ringstrom recorded the interaction on her phone. After the agent confronted her, Mrs. Ringstrom decided to return home and started driving away. Minutes later, unidentified masked federal agents in unmarked vehicles boxed Mrs. Ringstrom in so she could not move her car. Several agents got out of their vehicles, detained the 42-year-old mother of seven, and took her into custody. Before federal agents released Mrs. Ringstrom, an officer gave her a citation for impeding law enforcement. The officer also said that they would add Mrs. Ringstrom's name and photograph to a government database.[113]

236. On June 19, 2025, Job Garcia noticed masked CBP agents detaining at least five individuals in the parking lot of a Home Depot in Los Angeles as part of an immigration raid.[114] Mr. Garcia joined a group of bystanders expressing their disapproval of the officers' activities and started to record the incident on his phone.[115] Without warning, one of the masked agents grabbed Mr. Garcia's phone, threw it to the ground, and tackled him.[116] Several agents then rushed to pin Mr. Garcia to the ground with their knees on his back.[117] The agents handcuffed and detained Mr.

---

[113] Hesson, Cooke & Heath, *supra* note 32.

[114] Letter from Ernest I. Herrera, Reg'l Couns., & Eduardo Casas, Staff Att'y, Mexican Am. Legal Def. and Educ. Fund, to Offs. of Gen. Couns., DHS, Off. of Principal Legal Advisor, ICE, Off. of Chief Couns., CBP, L.A./Long Beach Field Off., CBP, & L.A. Field Off., ICE at 2 (July 1, 2025).

[115] *Id.* at 3.

[116] *Id.*

[117] *Id.*

Garcia.[118] CBP held Mr. Garcia in custody overnight, even after they confirmed that Mr. Garcia was a U.S. citizen and despite no criminal warrant or evidence that he had committed any crime.[119]

237. On December 9, 2025, Susan Tincher received an alert on her phone that ICE was arresting an individual in her Minneapolis neighborhood. Decl. of Susan Tincher at 1, *Tincher v. Mullin*, No. 25-cv-04669 (D. Minn. Dec. 17, 2025), ECF No. 1-1 ("Tincher Decl."). Mrs. Tincher drove to the reported area a few minutes from her home, where she saw what appeared to be several federal immigration agents standing and talking outside of a home. *Id.* Mrs. Tincher got out of her car, approached the officers on the perimeter, and asked an agent: "Are you ICE?" *Id.* The agents immediately started yelling at Ms. Tincher to "get back" and at each other to "[t]ake her down!" *Id.* at 1-2. About 15 seconds after Mrs. Tincher's first interaction with them, the agents grabbed Mrs. Tincher and pulled her to the ground. *Id.* The agents told Mrs. Tincher, "You are under arrest. This is what you get for interfering." Decl. of Nicole Sorensen at 3, *Tincher v. Mullin*, No. 25-cv-04669 (D. Minn. Dec. 17, 2025), ECF No. 1-12. The agents detained Mrs. Tincher in their truck. Tincher Decl. at 2. They then took Ms. Tincher into custody, patted her down extensively, took off her sweater, cut off her bra, removed her boots and socks, shackled her legs, cut her wedding ring off her finger, and searched her belongings. *Id.* at 3. Officers from Homeland Security Investigations read Mrs. Tincher her rights and asked if she would speak without a lawyer; Mrs. Tincher refused. *Id.* After over five hours, the federal agents released Mrs. Tincher. *Id.* The HSI agents claimed she would be charged with obstructing a police officer. *Id.* Mrs. Tincher described the episode as "a frightening experience that would scare anybody." *Id.* at 3.

---

[118] *Id.* at 3-4.
[119] *Id.* at 4.

238. On January 29, 2026, federal immigration officers detained a Minnesota woman for observing their activities, releasing her only when local police intervened. The woman, who spoke to reporters anonymously for fear of retribution, was following and filming federal immigration officers in her car when agents in three vehicles forced her to pull over, surrounded her vehicle with their guns drawn, and repeatedly yelled, "Get out of the car!" The woman reached out to other legal observers and asked them to call 911 on her behalf. Before she could call the police herself, the agents opened her car door, dragged her out into the street, aggressively pinned her down, and handcuffed her. The woman's husband eventually arrived and told the agents they could not search their car without a warrant, to which they responded that they would not "get[] into the legality of everything." The agents loaded the woman in one of their cars and drove towards the Twin Cities. The agents only let the woman go after her husband called St. Peter Chief of Police Matt Grochow, who called ICE and intervened on her behalf. In a social media post after the incident, DHS called the woman an "agitator [who] began stalking and obstructing law enforcement."[120]

239. In addition to detaining and investigating citizens for engaging in legal observation, Defendants have demonstrated a willingness to prosecute First Amendment activities as crimes.

240. DOJ has charged hundreds of local activists, including many legal observers, around the country for violations of 18 U.S.C. § 111, which prohibits individuals from "resist[ing], oppos[ing], imped[ing], intimidat[ing], or interfer[ing]" a federal officer in the course of their official duties. At least 655 people were prosecuted between the summer of 2025 and January

[120] Hannah Yang, Matt Sepic & David Schaper, *St. Peter police chief intervened and got federal agents to release resident, sources say*, MPR News (Jan. 31, 2026), https://www.mprnews.org/story/2026/01/30/st-peter-police-chief-intervenes-prevents-federal-agents-from-arresting-resident.

2026. That figure doubles the number of prosecutions under 18 U.S.C. § 111 during the same period in 2024 to 2025.[121]

241. On September 26, 2025, protesters outside an immigration facility in Broadview, Illinois, surrounded, pushed, scratched, and otherwise damaged a federal agent's vehicle during Operation Midway Blitz in Chicago. Federal prosecutors indicted six people from the crowd of protestors for conspiracy.[122] As the case headed for trial, prosecutors dismissed two of the defendants and dropped all felony charges against the remaining four, leaving misdemeanors only.[123] At a hearing just days before trial, evidence of prosecutorial misconduct—including grand jury manipulation—emerged.[124] DOJ dropped all remaining charges.[125]

242. On June 16, 2026, the Department of Justice charged 15 "members and associates" of Direct Action Minnesota ("DAMN") for "conspiracy to impede a federal officer, multiple counts of interstate stalking, [and] interstate threats[.]"[126] Acting Attorney General Todd Blanche called the defendants "members of Antifa groups, engaged in an unrelenting campaign of harassment and violence targeting federal and local law enforcement."[127] The Justice Department specifically targeted DAMN because it "is an organization dedicated and committed to direct action against federal law and immigration enforcement," including through "surveillance" of ICE enforcement

---

[121] Hesson, Cooke & Heath, *supra* note 32.
[122] Jon Seidel, *Transcripts reveal tension, improprieties during 'Broadview 6' grand jury hearings*, Chi. Sun Times (June 9, 2026), https://chicago.suntimes.com/immigration/2026/06/09/broadview-six-grand-jury-midway-blitz-boutros-trump.
[123] Kim Bellware, *The spectacular collapse of a case against ICE protesters: 'It's not justice, but it's a win'*, The Guardian (June 8, 2026), https://perma.cc/V9HQ-P8QC.
[124] *Id.*
[125] *Id.*
[126] U.S. Dep't of Just. (@TheJusticeDept), X (June 16, 2026), https://x.com/TheJusticeDept/status/2067011935980433746; Press Release, Off. of Pub. Affs., U.S. Dep't of Just., *15 Members of Direct Action Minnesota, a Minneapolis-Based Direct Action Group with Antifa Ties, Indicted* (June 16, 2026), https://perma.cc/GX4T-9WES.
[127] *Id.*

actions.[128] The DOJ also accused DAMN members of "harass[ing] and prevent[ing] officers from performing their official duties," and called their activities "inherently militant."[129] Minnesota U.S. Attorney Daniel N. Rosen said that the defendants were charged because "[t]hey all joined an agreement, a conspiracy to interfere with lawful immigration enforcement operations."[130]

243. DOJ's press release specifically points to legal observation as a reason for the charges. DOJ claimed that DAMN's "commuting tactics" violated federal law.[131] Those tactics include "identifying, following, surveilling, harassing, and confronting federal immigration enforcement with the goal of preventing, hindering, delaying, and impeding the enforcement of federal immigration law."[132] The Department suggests that DAMN's use of Signal and documents containing license plate numbers and other information about federal vehicles to "facilitate[] the identification of federal immigration and law enforcement vehicles" and dispatch legal observers to document federal immigration enforcement activity constitutes criminal activity.[133] And in their indictment, DOJ accused the DAMN defendants of carrying out the alleged conspiracy by, among others, "[u]tilizing counter-surveillance tactics to inform members about the activities of law enforcement at or around the Whipple Building" and "'commuting' tactics, which include identifying, following, surveilling, harassing, and confronting federal immigration enforcement with the goal of preventing, hindering, delaying, and impeding the enforcement of federal

---

[128] *Id.*
[129] *Id.*
[130] Dan Gooding, *Trump's DHS Announces Raids on Antifa Cells in Minnesota*, Newsweek (June 16, 2026), https://www.newsweek.com/dhs-antifa-cells-minnesota-ice-doj-charges-minneapolis-12079686.
[131] Press Release, Off. of Pub. Affs., U.S. Dep't of Just., *15 Members of Direct Action Minnesota, a Minneapolis-Based Direct Action Group with Antifa Ties, Indicted* (June 16, 2026), https://perma.cc/GX4T-9WES.
[132] *Id.*
[133] *Id.*

immigration law[.]" Indictment at 8-9, *United States v. Sant*, No. 0:26-cr-00115 (D. Minn. June 11, 2026), ECF No. 1 ("DAMN Indictment"). Mr. Rosen also told reporters that the case was based on NSPM-7, which directed federal law enforcement to investigate and prosecute cases of "domestic terrorism," including "doxing" and "civil disorder."[134]

244. A closer look at the indictment reveals that DOJ is charging legal observers with conspiracy to impede federal officers because of their First Amendment-protected activity. For example, DOJ indicted Isaac Sant in part because he was following federal immigration officers in the Minneapolis area. DAMN Indictment at 32. Federal immigration officers stopped Mr. Sant and warned that "any interference would constitute a violation of federal law." *Id.* Mr. Sant kept following the officers, which the indictment describes as "imped[ing] the transport of the detained individual." *Id.* DOJ also indicted William Morgan, in part, because she followed a federal immigration officer until local police in Hudson, Wisconsin stopped her. *Id.* at 86. Both Mr. Sant and Ms. Morgan were charged with interstate stalking for "travel[ing] in interstate or foreign commerce with the intent to . . . place under surveillance another person" and engaging in conduct that results in "substantial emotional distress." *Id.* at 91-92. Prosecutors have not ruled out the possibility of additional arrests in Minnesota.[135]

245. Judges have dismissed or prosecutors have dropped at least 79 cases relating to ICE protests or federal law enforcement surges across the District of Columbia, Chicago, Minnesota,

---

[134] *See* Pooja Salhotra, Alan Feuer & Jeff Ernst, *Claiming an Antifa Plot, U.S. Charges 15 in Minneapolis With Conspiracy*, N.Y. Times (June 16, 2026), https://www.nytimes.com/2026/06/16/us/minnesota-immigration-charges-antifa.html; Countering Domestic Terrorism and Organized Political Violence, Nat'l Sec. Presidential Mem.-7, 90 Fed. Reg. 47225, 47225-27 (Sep. 25, 2025).
[135] Salhotra, Feuer & Ernst, *supra* note 134.

and Los Angeles. According to one judge, in a period of two months, the U.S. Attorney's Office in the District of Columbia dropped more cases than it had in the previous 10 years combined.[136]

**E. Defendants retaliate against constitutional observers using civil sanctions.**

246. In furtherance of their policies, Defendants subject legal observers to civil sanctions, including the revocation of travel privileges without process and administrative subpoenas tied to criminal investigations. This retaliation is evidenced by the following examples.

247. Defendants most frequently revoke Global Entry and/or TSA-PreCheck status. Global Entry and PreCheck are services for which airline passengers undergo a background check and in-person interview with CBP and pay for the privilege of using alternate, faster security screening lines at airports.

248. On March 17, 2026, while conducting constitutional observation, Michael Khalili followed a vehicle leaving a federal ICE facility in Minneapolis. After arriving at Shakopee City Hall's parking lot, two federal agents stopped their vehicle and got out to take a photo of Mr. Khalili's front license plate and a photo of him. The agent near his window screamed at Mr. Khalili to stop following them. The next day, Mr. Khalili received an email that his Global Status Entry had changed. When he logged into the CBP portal, he accessed a letter that said, "We regret to inform you that your membership in Global Entry has been revoked for the following reason(s): Your Global Entry has been revoked." No other explanation was given. On information and belief, the agents revoked Mr. Khalili's Global Entry status after searching for his information in a federal database and finding that he acted as a legal observer in the past. DHS restored his Global Entry privileges after a reporter contacted the agency about his case.

[136] Dani Schulkin, Ryan Goodman & Huzaifa Khan, *"Zero Evidence": How Judges and Grand Juries Have Rejected Trump Administration Efforts to Investigate and Prosecute*, Just Sec. (July 20, 2026), https://perma.cc/6F7E-4FHB.

249. In August 2026, after multiple interactions with DHS agents, Mr. Khalili requested his motor vehicle records from the Minnesota Driver and Vehicle Services. Before this year, there were only two queries of his vehicle's license plate, driver's license, and/or name and date of birth.

250. Once he started constitutional observation, those queries increased dramatically. Over a four-month period beginning in March 2026, federal, state, and local law enforcement officers ran his license plate, driver's license, and/or name and date of birth to identify him 55 times.

251. Three days after an interaction with DHS agents she did not know but who referred to her by her first name, Nicole Cleland received an email notice that her Global Entry and PreCheck privileges had been revoked. Cleland Decl. at 3. The notification listed several potential reasons for the revocation, including a "violation of any customs, immigration, or agriculture regulations, procedures, or laws in any county." *Id.* Given the timing, Ms. Cleland believes the revocation is likely retaliation for her activities as a legal observer. *Id.* Now, Ms. Cleland fears "how far-reaching ICE can be" and is "struggling to figure out what [she] can do, without putting [herself] at greater risk or putting other people at risk."[137]

252. On July 18, 2025, days after an interaction with DHS agents in which James Mitchell West was told to delete a photo that he had taken while observing an agent, Mr. West's Global Entry and PreCheck status was revoked. Decl. of James Mitchell West at 5-6, *Demster v. Blanche*, No. 2:26-cv-02546 (W.D. Tenn. May 28, 2026), ECF No. 16-54 ("West Decl."). Mr. West received an email stating that he no longer met the eligibility requirements for Global Entry. *Id.* at 6. The notice indicated that it may have been because he was subject to a law enforcement investigation and/or is suspected of being or having been engaged in conduct constituting, in

[137] Frenkel & Krolik, *supra* note 60.

preparation for, in aid of, or related to terrorism. *Id.* He reapplied for Global Entry, but his application has been pending for eight months. *Id.* at 7.

253. DHS agents have also relied on administrative subpoenas to further baseless criminal investigations or learn the identities of constitutional observers.

254. On January 28, 2026, DHS initiated "Operation Puppet Master" to "identif[y] an organized network of conspirators operating through online and in person who are providing material support to violent opportunists and agitators involved in impeding federal law enforcement."[138]

255. Shortly thereafter, DHS initiated a follow-up investigation, "Project Whipple Shield." That sprawling investigation touched the lives of teachers, veterans, and union members who, in many instances, met to discuss monitoring ICE agents or abolishing ICE altogether. Despite participating in First Amendment-protected activity with no connection to criminal conduct, HSI nevertheless used its administrative subpoena power to secretly collect more than three years of financial data from an environmental action group and three labor unions. Undercover agents also spied on meetings held online and in libraries, parks, and churches, creating a record of what was said, participants' names, and even their license plate numbers. The undercover agents infiltrated group chats on Signal too, listening as activists discussed coming demonstrations and their political opinions.[139]

---

[138] Dep't of Homeland Sec., Homeland Sec. Investigations, Report of Investigation, Case Number: MS02PR26MS0003, Operation Puppet Master, Case Opening, at 2 (Jan. 28, 2026), https://perma.cc/44DW-YX4R.

[139] Alan Feuer & Ernesto Londoño, *U.S. Investigated Left-Leaning Groups During Minnesota Immigration Crackdown*, N.Y. Times (Aug. 13, 2026), https://www.nytimes.com/2026/08/13/us/politics/dhs-inquiry-immigration-protests-minnesota.html.

256. On September 4, 2025, DHS issued an administrative subpoena to Meta to learn the identities of the individuals running six accounts in Southern California that documented immigration enforcement activity, including LB Protest, Long Beach Rapid Response Network, and Stopice.net. After the individuals challenged the subpoena in court, DHS withdrew it.[140]

257. On September 11, 2025, DHS issued two administrative subpoenas to Instagram and Facebook to identify the user of MontCo Community Watch, an account in Pennsylvania that documented immigration enforcement activity. After the user challenged the subpoenas in court, DHS withdrew them.[141]

**IV. Defendants' compilation and use of data on legal observers is an unannounced change in data usage that violates the Privacy Act.**

258. The Privacy Act imposes several procedural safeguards when a federal agency uses data in systematic ways. Congress enacted these safeguards to "permit an individual to determine what records pertaining to him are collected, maintained, used, or disseminated by [federal] agencies" and ensure "adequate safeguards are provided to prevent misuse of such information." Privacy Act of 1974 § 2(b)(1), (4), Pub. L. No. 93-579, 88 Stat. 1896 (1974) (codified at 5 U.S.C. § 552a note).

259. One of these safeguards includes strict notice and comment requirements governing any "system of records." 5 U.S.C. § 552a(a)(5).

260. When an agency "establish[es] or revis[es]" a system, it must "publish in the Federal Register . . . a notice of the existence and character of the system of records." *Id.* § 552a(e)(4). This is known as a system of records notice ("SORN").

---

[140] Mario Trujillo, *A List of ICE Subpoenas to Tech Companies*, Elec. Frontier Found. (Aug. 26, 2026), https://perma.cc/5VHJ-NTWT.
[141] *Id.*

261. Federal agencies must provide at least 30-days' notice, along with "an opportunity for interested persons to submit written data, views, or arguments to the agency." *Id.* § 552a(e)(11).

262. The experiences of Plaintiffs and other Americans engaged in lawful First Amendment activities overwhelmingly establish that Defendants are gathering information about individuals engaged in constitutionally protected activity and logging that information into databases or watchlists that Defendants maintain and access. *See supra* Parts II.B-C.

263. This systematic collection and synthesis of data on constitutional observers requires a system of records to function. Defendants are required to publish a SORN reflecting this usage of data. Nevertheless, Defendants have failed to publish any notice in the Federal Register or solicit any public comments regarding the creation or revised use of any system of records, including DHS's Automatic Targeting System.

264. The failure to engage in required notice and comment procedures has deprived Plaintiffs of any understanding of the existence and character of systems of records Defendants access and/or maintain regarding protected First Amendment activities, including notably: (1) the categories of individuals on whom records are maintained in the system; (2) the categories of records maintained in the system; (3) each routine use of the records contained in the system, including the categories of users and the purpose of such use; and (4) the categories of sources of records in the system. *See* 5 U.S.C. § 552a(e)(4)(B)-(D), (I). Without this information, Plaintiffs are deprived of understanding what information Defendants have and are maintaining about Plaintiffs' and their members' First Amendment activities, how that information is collected, and how it is used.

265. Nor were Plaintiffs afforded an opportunity to provide any public comment on Defendants' use of their sensitive data.

266. Common Cause would have commented on any SORN related to the collection of this information. Indeed, Common Cause has commented previously on SORNs, including as recently as July 31, 2026, when it submitted a comment opposing the Department of Health and Human Services' proposed modification to the Temporary Assistance for Needy Families data, System Number 09-80-0375.[142]

267. Defendants' violation of the Privacy Act's statutorily mandated procedure is protected and enforceable through the APA, which authorizes courts to "set aside agency action . . . [taken] without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

## V. Defendants' Intimidation and Retaliation Policy has already had far-reaching chilling effects that dissuade people from exercising their First Amendment rights and peacefully observing immigration enforcement.

268. Defendants' Intimidation and Retaliation Policy against constitutional observers, which is supercharged by their immensely powerful investigative tools, would intimidate any reasonable person. The government has purposefully acted to instill that fear, actively deterring the public from observing and sharing information about the realities of the Administration's mass deportation campaign.

269. Federal agents' threats of force and criminal sanctions are chilling because there should be no physical or legal repercussions for exercising one's First Amendment rights. The fact that countless agents have resorted to unlawful force to stop peaceful observation and federal prosecutors have aggressively pursued charges against observers engaging in lawful First Amendment conduct only adds to the chilling effect.

270. Neither Defendants' Intimidation and Retaliation Policy, nor its chilling effects, stop there. Federal agents also record observers' faces, capture their license plate information, issue

[142] Dep't of Health & Hum. Servs., Admin. for Child. & Fams., Privacy Act of 1974; System of Records Notice, 91 Fed. Reg. 37406 (June 23, 2026).

secret administrative subpoenas without any connection to criminal conduct, aggregate personal data, and maintain that information in government databases—including "domestic terrorist" watchlists—for future use, all because someone observed and documented immigration enforcement activities in their community. The Federal government then uses that information to track the movements, communications, and associations of constitutional observers.

271. The fear "that the government may be watching chills associational and expressive freedoms." *United States v. Jones*, 565 U.S. 400, 416 (2012) (Sotomayor, J., concurring); *cf. Carpenter v. United States*, 585 U.S. 296, 305 (2018) (explaining, in the Fourth Amendment context, that the Framers intended "to place obstacles in the way of a too permeating police surveillance") (internal quotation marks and citation omitted). It reasonably deters many observers from exercising their First Amendment rights.

272. It is objectively frightening to have a federal agent aim their weapon at you, physically assault you, use their vehicles to prevent you from leaving, call you by name without ever having been introduced, and show up at your home or workplace.

273. It is also objectively frightening to be arrested and charged with a crime, lose your Global Entry or TSA PreCheck privileges, or be labeled as a "domestic terrorist" in federal databases.

274. Engaging in constitutional observation now carries immense risk. That risk includes being subjected to broad-ranging government investigations or criminal charges, enhanced screening at airports and land borders, and visa complications, among others.

275. The Administration's rhetoric and tendency to misrepresent the facts surrounding interactions with observers raise a reasonable fear of other risks, such as failed background checks

impacting employment or professional licensure, loss of access to bank accounts or lines of credit, and threats to physical safety.

276. Against the backdrop of NSPM-7 and the December 2025 Attorney General Memo, Defendants' "domestic terrorist" and "violent rioter" labels have a particularly acute chilling effect on collective protected activity, such as organizing with others to observe and record federal immigration operations.

277. Given Defendants' Intimidation and Retaliation Policy and federal agents' implementation of that policy, individuals have good reason to fear that they will face retaliation for their constitutional observation.

278. Plaintiff Common Cause's members have experienced the chilling effect of Defendants' policies and practices.

279. After being surveilled in their neighborhood, filmed by at least two DHS agents, threatened with prosecution, and seeing those agents near their home and their place of employment, Common Cause member 1 has substantial fear for their safety and that of their family's every time they engage in constitutional observation.

280. Common Cause member 2 has scaled back their constitutional observation activities in frequency and intensity. After conducting constitutional observation nearly daily, a single incident in September 2025 where agents followed Common Cause member 2 and took photos of their face and license plate convinced Common Cause member 2 to stop observing. Their reticence to return to constitutional observation is the result of fear that agents will further retaliate against them or their family.

281. Common Cause member 3 has adjusted their constitutional observation too. They used to conduct their observation at least eight times per month from the parking lot outside of the

local DHS office. But after DHS agents lobbied local police officers to permanently ban Common Cause member 3 from this public parking lot, they now conduct observation by driving by on a nearby road.

282. Several members of Common Cause who have experienced similar retaliation declined to have their experiences recounted in this Complaint, even anonymously, out of fear that they could be subjected to further retaliation and harm.

283. In addition to Common Cause and its members, Michael Khalili has experienced the chilling effects of Defendants' policies and practices.

284. After having his Global Entry revoked, experiencing the May 4, 2026 incident where a state trooper threatened Mr. Khalili with criminal charges for observing federal agents, and realizing that fellow observer Isaac Sant had been indicted for similar activities on the same date the state trooper had threatened Mr. Khalili, *see supra* ¶¶ 68-76, Mr. Khalili and his wife decided that he should stop observing permanently for fear that the federal government would come to their home and arrest him in front of his children.

## CLAIMS

### COUNT ONE
### Retaliation in Violation of the First Amendment of the United States Constitution
### (All Plaintiffs Against All Defendants)

285. Plaintiffs incorporate by reference each of the paragraphs in this Complaint as if restated fully herein.

286. Defendants' Intimidation and Retaliation Policy violates the First Amendment rights of constitutional observers.

287. Plaintiffs have engaged in constitutionally protected activities—namely, peacefully observing or recording immigration enforcement operations to hold federal agents accountable for

their aggressive and brutal tactics. Plaintiffs wish to continue engaging in these constitutionally protected activities.

288. The First Amendment supports Americans' right to dissent through observation. It protects photos, videos, and recordings. *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 790 (2011). For this protection to have any meaning, the First Amendment must likewise protect the act of creating that material.

289. Drawing upon these principles and the inherently expressive nature of constitutional observation, courts have repeatedly found that the First Amendment protects the right to peacefully observe and/or record law enforcement officers engaged in their official duties in public. *See, e.g.*, *Massimino v. Benoit*, No. 25-1104, 2026 WL 2386308, at *5 (2d Cir. Aug. 17, 2026); *Sharpe v. Winterville Police Dep't*, 59 F.4th 674, 680-81 (4th Cir. 2023); *Irizarry v. Yehia*, 38 F.4th 1282, 1294 (10th Cir. 2022); *Fields v. City of Philadelphia*, 862 F.3d 353, 359-60 (3d Cir. 2017); *Turner v. Lieutenant Driver*, 848 F.3d 678, 690 (5th Cir. 2017); *Gericke v. Begin*, 753 F.3d 1, 7-8 (1st Cir. 2014); *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 595 (7th Cir. 2012); *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000); *Fordyce v. City of Seattle*, 55 F.3d 436, 438 (9th Cir. 1995).

290. Defendants have subjected Plaintiffs to adverse actions through the Intimidation and Retaliation Policy that would likely deter a person of ordinary firmness from engaging in similar protected First Amendment activity.

291. There is an ongoing, nationwide pattern or practice of federal agents making similar threats and engaging in similar retaliatory acts of harassment and intimidation.

292. Defendants' actions against Plaintiffs are substantially motivated by Plaintiffs' observing and recording federal agents performing their duties in public.

293. Defendants' ongoing conduct in violation of Plaintiffs' First Amendment rights has caused and is causing them irreparable harm.

**COUNT TWO**
**Infringement of Free Speech, Assembly, and Association in Violation of the First Amendment of the United States Constitution**
**(All Plaintiffs Against All Defendants)**

294. Plaintiffs incorporate by reference each of the paragraphs in this Complaint as if restated fully herein.

295. Plaintiffs have engaged in constitutionally protected activities, including peacefully observing or recording federal agents performing their duties in public. Plaintiffs wish to continue engaging in these constitutionally protected activities.

296. To chill the exercise of First Amendment rights, Defendants have threatened Plaintiffs and other constitutional observers with force and arrest, collected and used observers' own personal information to intimidate them, used excessive force, pursued criminal charges, and subjected observers to administrative penalties like the revocation of Global Entry or TSA PreCheck.

297. Defendants' actions, pursuant to their Intimidation and Retaliation Policy, are designed to chill, suppress, and control disfavored speech and association, including lawful observation of immigration enforcement activities.

298. These acts would chill a reasonable person from continuing to engage in constitutional observation.

299. Defendants' actions have indeed chilled Plaintiffs' speech and continue to subject them to a credible threat of future criminal enforcement.

300. Defendants' actions do not serve any government interest, much less a significant or compelling interest.

301. Defendants' actions are not narrowly tailored to any government interest.

302. Defendants' ongoing conduct in violation of Plaintiffs' First Amendment rights has caused and is causing them irreparable harm.

**COUNT THREE**
**Agency Action without Proper Procedure Required by Law in Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(D) and Privacy Act, 5 U.S.C. § 552a(e)(11)**
**(All Plaintiffs Against Defendants United States Department of Homeland Security, Immigration and Customs Enforcement, Enforcement and Removal Operations, Homeland Security Investigations, and United States Customs and Border Patrol)**

303. Plaintiffs incorporate by reference each of the paragraphs in this Complaint as if fully restated herein.

304. Defendants United States Department of Homeland Security, Immigration and Customs Enforcement, Enforcement and Removal Operations, Homeland Security Operations, and United States Customs and Border Patrol are each an agency within the meaning of the APA. *See* 5 U.S.C. § 551(1).

305. The APA authorizes judicial review of final agency action. 5 U.S.C. § 704.

306. The APA defines "agency action" to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." *Id.* § 701(b)(2); *see also id.* § 551.

307. Final agency actions are those that: (1) "mark the consummation of the agency's decisionmaking process"; and (2) "by which rights or obligations have been determined, or from which legal consequences flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citation modified).

308. A court reviewing an agency action "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

309. The Privacy Act establishes strict notice and comment requirements for when an agency "establish[es] or revis[es]" any "system of records." 5 U.S.C. § 552a(e)(4), (11). The agency must "publish in the Federal Register . . . a notice of the existence and character of the system of records"—known as a SORN—to "provide an opportunity for interested persons to submit written data, views, or arguments to the agency" at least 30 days in advance. 5 U.S.C. § 552a(e)(4), (11); *see also* Off. of Mgmt. & Budget, Circular No. A-108, Federal Agency Responsibilities for Review, Reporting, and Publication Under the Privacy Act, at 7, 12 (2016), https://perma.cc/Z4MV-TS8Z ("OMB Circular No. A-108").

310. Each SORN "shall include" nine categories of information:

- [T]he name and location of the system;
- the categories of individuals on whom records are maintained in the system;
- the categories of records maintained in the system;
- each routine use of the records contained in the system, including the categories of users and the purpose of such use;
- the policies and practices of the agency regarding storage, retrievability, access controls, retention, and disposal of the records;
- the title and business address of the agency official who is responsible for the system of records;
- the agency procedures whereby an individual can be notified at [their] request if the system of records contains a record pertaining to [them];
- the agency procedures whereby an individual can be notified at [their] request how [they] can gain access to any record pertaining to [them] contained in the system of records, and how [they] can contest its content; and
- the categories of sources of records in the system.

5 U.S.C. § 552a(e)(4)(A)-(I).

311. "In no circumstance may an agency use a new or significantly modified routine use as the basis for a disclosure fewer than 30 days following *Federal Register* publication." OMB Circular No. A-108 at 7; *see also id.* at 12 ("Agencies shall publish notice of any new or significantly modified routine uses sufficiently in advance of the proposed effective date of the routine uses to permit time for the public to comment and for the agency to review those comments.

In all cases, the Privacy Act requires agencies to publish any new or modified routine use at least 30 days before the effective date of the routine use."). Agencies "shall" then review and consider any "public comments on a published SORN." *Id.* at 7.

312. Defendants collect, maintain, and access information about the First Amendment-protected activities of Plaintiffs and other legal observers to further Defendants' policy and practice of retaliation. This collection and use of information is not authorized under any existing DHS SORN for its Automated Targeting System or any other DHS system of records.

313. Defendants have therefore established a new system or revised an existing system of records without issuance of a new or modified SORN in violation of the Privacy Act.

314. Along with failing to issue a new or modified SORN for the records obtained to further Defendants' Intimidation and Retaliation Policy, Defendants have likewise failed to provide a period of notice and comment regarding the establishment or revision of federal agency records in violation of the Privacy Act.

315. Defendants' failure to comply with the Privacy Act demonstrates that Defendants have acted without observance of procedure required by law in violation of the APA. 5 U.S.C. § 706(2)(D).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment, including using its equitable powers and authority pursuant to 5 U.S.C. § 706, to enter interim, preliminary, and permanent orders:

A. A declaration, pursuant to 28 U.S.C. § 2201, that the federal actions described in this Complaint constitute violations of the First Amendment;

B. A declaration, pursuant to 28 U.S.C. § 2201, that constitutional observers do not assault, resist, oppose, impede, intimidate, or interfere with federal law enforcement

under 18 U.S.C. § 111 when they engage in First Amendment-protected observation, including photographing or recording videos, without additional criminal elements or acts;

C. A declaration, pursuant to 28 U.S.C. § 2201, that constitutional observers do not engage in doxxing, an act of violence, or criminal conduct when they engage in First Amendment-protected observation, including photographing or recording videos or sharing information about federal immigration agents' location or activities, without additional criminal elements or acts;

D. A permanent injunction barring Defendants, their officers, officials, agents, servants, employees, attorneys, and all persons acting in concert or participation with them from implementing the Intimidation and Retaliation Policy;

E. An order barring Defendants from collecting, synthesizing, or querying records based on Plaintiffs' and their members' exercise of their First Amendment rights and using that information to implement the Intimidation and Retaliation Policy;

F. An order requiring expungement of any records collected or maintained about constitutional observers based on their exercise of First Amendment rights;

G. Holding unlawful and setting aside, pursuant to 5 U.S.C. § 706(2)(D), the creation or revision of any agency system of records that includes maintenance of information about protected First Amendment activities as an agency action without proper procedure required by the Privacy Act;

H. Attorneys' fees, costs, and expenses; and

I. Such other and further relief as the Court may deem just and proper.

Dated: September 10, 2026

Respectfully submitted,

*/s/ Danielle Lang*
Danielle Lang (D.C. Bar No. 1500218)
Sejal Jhaveri (D.C. Bar No. 90043488)
Robyn K. Bitner (D.C. Bar No. 1617036)
Renata O'Donnell (D.C. Bar No. 1723929)
David Kronig (D.C. Bar No. 1030649)
William Hancock (D.C. Bar No. 90002204)
Daniel Brophy* (Ill. Bar No. 6352742)
CAMPAIGN LEGAL CENTER
1101 14th St. NW, Suite 400
Washington, D.C. 20005
(202) 736-2200
dlang@campaignlegalcenter.org
sjhaveri@campaignlegalcenter.org
rbitner@campaignlegalcenter.org
rodonnell@campaignlegalcenter.org
dkronig@campaignlegalcenter.org
whancock@campaignlegalcenter.org
dbrophy@campaignlegalcenter.org

**Pro hac vice* motion forthcoming